Natthu S. PARATE, Plaintiff-Appellant,

v.

Edward I. ISIBOR, individually and in his official capacity as Dean of the School of Engineering & Technology at Tennessee State University; Michael Samuchin, individually and in his official capacity as Head of the Civil Engineering Department of the School of Engineering and Technology at Tennessee State University; President of Tennessee State University, in his official capacity; and Chancellor of the Board of Regents of the State University and Community College System of Tennessee, in his official capacity, Defendants-Appellees.

No. 87-6100.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 11, 1988.

Decided Feb. 17, 1989.

Rehearing Denied March 16, 1989.

Linda A. Ross, Gilbert and Milom, and Aleta Arthur (argued), Nashville, Tenn., for plaintiff-appellant.

W.J. Michael Cody, Atty. Gen. of Tenn., Nashville, Tenn., Christine Modisher (argued), Ronald Routson, Larry Woods (argued), Woods & Woods, Nashville, Tenn., for defendants-appellees.

Ann H. Franke (argued), Washington, D.C., for amicus curiae, American Ass'n of University Professors.

Before KEITH, JONES and MILBURN, Circuit Judges.

KEITH, Circuit Judge.

Plaintiff Natthu S. Parate ("Parate"), whose contract to teach at Tennessee State University ("TSU") was not renewed, brought this civil rights action against defendants, various officials of TSU and the State University and Community College System of Tennessee. Parate complained that the defendants violated his First and Fourteenth Amendment rights. The district court dismissed Parate's claims under 42 U.S.C. § 1983 with prejudice; dismissed his pendent state law claims without prejudice; and granted summary judgment in favor of the defendants. For the following reasons, we AFFIRM in part and REVERSE in part.

I.

Parate, a native of India, was appointed associate professor in the TSU Civil Engineering Department for the 1982–83 academic year, effective August 23, 1982. Parate received his Bachelor of Engineering degree from a university in India; his Master's degree from a university in England; and his Doctorate degree from a university in France. He has also done post-doctoral work in both France and Canada. Parate was appointed to a tenure-track position which was subject to renewal on an annual basis. At all relevant times, Edward I. Isibor, a Nigerian, served as Dean of the School of Engineering and Technology, and Michael Samuchin served as Head of the Department of Civil Engineering.

In his first semester at TSU, Parate taught the course "Groundwater and Seepage" ("GWS"). At the beginning of the semester, Parate informed the class of his grading criteria. Students who earned 90 to 100 percent of the total coursework points would receive an "A" grade, and students who earned 80 to 90 percent would receive a "B" grade. The percentages were derived from points assigned to homework, class discussion, and examinations. Parate also stated that when awarding grades, he would consider individual students' extenuating circumstances.

After Parate distributed final grades in the "GWS" course, two students in the class, Students "X" and "Y,"[1] approached Parate and requested grade changes. Students "X" and "Y" had received final grades of 86.1 and 86.4, respectively. Student "X" contended that his grade should be changed because he had been involved in a serious legal matter while enrolled in the course. To support his argument, Stu-

---

1. Parate has referred to these individuals as Students "A" and "B" to protect their privacy. *See* Brief of Plaintiff–Appellant at 4. In the interest of clarity, we will refer to them as Students "X" and "Y".

dent "X" showed Parate a court summons for a date in January, the month after the final exam. Parate reviewed Student "X's" performance and noted that he had fared better on the midterm examination than he had on the final examination. On the basis of Student "X's" overall course work and his extenuating personal circumstances, Parate agreed to change his grade to an "A." Parate discussed the matter with Samuchin, who concurred in the grade change.

Student "Y" also requested a grade change. However, because Student "Y" had cheated on the final examination and presented false medical excuses, Parate declined to change his grade. Parate explained that he personally observed Student "Y" cheating on the final examination; confronted him; and refused to give him credit for plagiarized answers. In addition, Parate recalled that Student "Y" had previously offered medical excuses lacking in credibility. On one occasion, Student "Y's" note said that he was indisposed by a headache, but on a day when no class was scheduled. Another note submitted by Student "Y" had been altered with "white-out" and was written over to state the student "was not prepared for exam." After hearing Parate's explanation, Samuchin concurred in his decision not to change Student "Y's" grade. When advised by Parate that his grade would not be changed, Student "Y," also a Nigerian, said that he would get his grade changed "through the Dean."

On February 14, 1983, Student "Y" contacted Isibor and appealed for a grade change in the "GWS" course. On February 26, 1983, Parate met with Mohan Malkani, the Associate Dean of the School of Engineering and Technology. After hearing Parate's explanation, Malkani agreed that there was no valid reason to change Student "Y's" grade to an "A." Isibor insisted that Parate meet with him, Malkani and Samuchin on March 3, 1983. At the meeting, Isibor instructed Parate to change Student "Y's" grade to an "A." Isibor also insisted that Parate sign a memorandum changing his official grading distribution for the "GWS" course so that a grade of 86 would be an "A" instead of a "B." When Parate refused, Isibor began to insult and berate him. Isibor said that Parate did not know how to teach, asked him where he got his degree, and stated that it would be very difficult to renew Parate's contract at TSU.

On the following day, Samuchin again met with Parate. Samuchin had prepared memoranda for Parate's signature that referred to the purported change in the grading criteria for the "GWS" course. The memoranda also requested grade changes for both Students "X" and "Y." Although Parate signed the memoranda, he added a notation to each copy: "as per instructions from Dean and Department Head at meeting." Later the same day, Samuchin returned with retyped memoranda and explained to Parate that there was to be no notation referring to Isibor's instructions. Samuchin then warned Parate that if he failed to sign the retyped memoranda, then Isibor would "mess up" his evaluation. Parate signed the second set of memoranda, but to signify his protest, used a signature different from his normal one. Samuchin then returned with a third set of retyped memoranda, which Parate ultimately signed due to his fear of future reprisals from Isibor.

During both the 1983–84 and the 1984–85 academic years, Samuchin and Isibor engaged in a variety of retaliatory acts against Parate due to the "GWS" course incident. Samuchin and Isibor challenged Parate's grading criteria in other courses; sent him a letter critical of his teaching methods; and penalized him with low performance evaluations. By refusing Parate's requests for authorized professional travel and appropriate reimbursements, Samuchin and Isibor impeded Parate's research efforts and his presentation of papers at professional conferences. Ultimately, Samuchin and Isibor recommended the non-renewal of Parate's teaching contract.

On March 19, 1985, the President of TSU sent Parate a letter indicating that his tenure track appointment would not be renewed beyond the 1985–86 academic year.

The letter stated that Parate could request from Samuchin a statement of reasons for non-renewal. Samuchin, however, never responded to Parate's request for such a statement. To resolve his differences with Isibor, Parate arranged a meeting on September 16, 1985. During this meeting, Isibor said that if Parate's performance improved, consideration would be given to the renewal of his teaching contract. Isibor concluded by telling Parate "you must obey and never disobey your Dean."

In late September 1985, one of Parate's classes was interrupted by a graduate student. This student demanded that Parate change his final grade in a course which had ended the previous year. On October 2, 1985, two Nigerian students complained about the grades they had received on a "Statics" course examination just returned by Parate. These students demanded "As" on the exam; questioned Parate's teaching competence in front of his other students; and threatened to go to Isibor. These students also stated that they would insure that Parate would not teach the "Statics" course in following semesters.

Two days later, on October 4, 1985, Parate held his "Statics" class as scheduled. Isibor and Samuchin, however, had preceded him into the classroom unannounced. After Parate began to call the roll, he was immediately interrupted. Isibor shouted from the back of the room: "Stop the roll call, don't waste time; circulate the paper for a roll call." Adhering to Isibor's directive, Parate began to teach his class, but was again interrupted by Isibor's shouts. Isibor next ordered Parate to complete one of the problems from the textbook. After Parate began to work out the problem on the blackboard and explain it to the students, Isibor again interrupted him. Isibor demanded that Parate complete the problem on the blackboard without addressing the students; that the students complete the problem on paper; and that Samuchin copy Parate's work from the board. Isibor soon approached the blackboard himself and began to work on the same problem that Parate and the students were completing. After severely criticizing Parate's teaching skills in front of his students, Isibor collected the students' papers and left the classroom.

After this class, Parate was summoned to a meeting with Isibor, Samuchin, Malkani, and a professor from the TSU Department of Industrial Arts and Technology. Isibor again began to berate Parate. He said that some of Parate's students were more intelligent than their teacher, and that Parate's salary could be stopped at any time. Isibor then removed Parate from his post as instructor of the "Statics" course, but directed Parate to attend the class as a student. Parate attended the class for five or six sessions, but was then told that Isibor no longer wanted him to attend. During that semester, Parate was never reinstated as the instructor of the "Statics" class. In the remainder of Parate's final academic year, 1985–86, Isibor and Samuchin continually sent faculty observers to his classroom.

## II.

On April 4, 1986, Parate brought this civil action pursuant to 42 U.S.C. § 1983 against Isibor, individually and in his official capacity as Dean of the School of Engineering and Technology at TSU; Samuchin, individually and in his official capacity as Head of the Civil Engineering Department of the School of Engineering and Technology at TSU; Tennessee State University; and the Board of Regents of the State University and Community College System of Tennessee. An amended complaint was filed on June 25, 1986, substituting the President of TSU and the Chancellor of the Board of Regents, in their official capacities as defendants in lieu of TSU and the Board of Regents.

In his complaint, Parate asserted causes of action for violations of his right to academic freedom under the First Amendment, and his liberty and due process interests under the Fourteenth Amendment. He also alleged state law claims for defamation, interference with his property right to work, retaliatory discharge, and intentional infliction of emotional distress.

Parate then sought preliminary and injunctive relief, as well as an award of damages.

On April 10, 1986, Parate filed a motion for preliminary injunction. In an order entered June 5, 1986, the district court denied Parate's motion for preliminary injunction and the defendants' motion to dismiss. Defendants Isibor and Samuchin, in their individual capacities, filed a motion for summary judgment on October 7, 1986. All of the defendants, in their official capacities, filed motions for summary judgment or dismissal on October 21, 1986. An amended motion for summary judgment or dismissal was filed by the defendants in their official capacities on October 22, 1986.

On December 2, 1986, the defendant's motions for summary judgment or dismissal were referred to a magistrate. After concluding that the motions for summary judgment should be granted, the magistrate filed a Report and Recommendation on January 23, 1987. Parate filed objections to the Report and Recommendation on February 2, 1987. In an order entered August 28, 1987, the district court dismissed Parate's claims under 42 U.S.C. § 1983 with prejudice; dismissed his pendent state law claims without prejudice; and granted the defendants' motions for summary judgment.

Parate filed a timely notice of appeal on September 25, 1987. The following issues are presently before this Court: (1) whether the district court erred in dismissing Parate's First Amendment claims resulting from the March 3, 1983 grading incident; (2) whether the district court erred in dismissing Parate's First Amendment claims resulting from the October 4, 1985, grading incident; (3) whether the district court erred in dismissing Parate's claims under the Fourteenth Amendment; and (4) whether the district court erred in denying Parate's application for a preliminary injunction.

### III.

Judge Posner of the Seventh Circuit has explained that the term academic freedom "is used to denote both the freedom of the academy to pursue its end without interfer-

ence from the government ... and the freedom of the individual teacher ... to pursue his ends without interference from the academy; and these two freedoms are in conflict." *Piarowski v. Illinois Community College Dist. 515, 759* F.2d 625, 629 (7th Cir.), *cert. denied,* 474 U.S. 1007, 106 S.Ct. 528, 88 L.Ed.2d 460 (1985). Other commentators have identified the problems inherent in resolving clashes between the academy and individual academics when both parties claim a constitutional right to academic freedom. *See, e.g.,* Mertz, *The Burden of Proof and Academic Freedom: Protection for Institution or Individual?,* 82 Nw.U.L.Rev. 492, 493 (1988); *Developments in the Law—Academic Freedom,* 81 Harv.L.Rev. 1045 (1968).

Academic freedom thrives not only on the robust and uninhibited exchange of ideas between the individual professor and his students, but also on the "autonomous decisionmaking [of] ... the academy itself." *Regents of the Univ. of Mich. v. Ewing,* 474 U.S. 214, 226 & n. 12, 106 S.Ct. 507, 514 & n. 12, 88 L.Ed.2d 523 (1985). Justice Frankfurter summarized the "four essential freedoms" of the university:

> " 'It is the business of a university to provide that atmosphere which is most conducive to speculation, experiment and creation. It is an atmosphere in which there prevails "the four essential freedoms" of a university—to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study.' "

*Sweezy v. New Hampshire,* 354 U.S. 234, 263, 77 S.Ct. 1203, 1218, 1 L.Ed.2d 1311 (1957) (concurring in result), *quoted in Regents of the Univ. of Cal. v. Bakke,* 438 U.S. 265, 312, 98 S.Ct. 2733, 2759, 57 L.Ed. 2d 750 (1978) (opinion of Powell, J.). Thus, while the Supreme Court has often expressed a reluctance to intervene in the prerogatives of state and local educational institutions, it has remained committed to the protection of their academic freedom, "a special concern of the First Amendment." *Keyishian v. Board of Regents,*

385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967).

■ The administration of the university rests not with the courts, but with the administrators of the institution. A nontenured professor does not escape reasonable supervision in the manner in which she conducts her classes or assigns her grades. *See Megill v. Board of Regents of the St. of Fla.*, 541 F.2d 1073 (5th Cir.1976). University officials remain free to review a professor's classroom activities when determining whether to grant or deny tenure. The university may constitutionally choose not to renew the contract of a nontenured professor whose pedagogical attitude and teaching methods do not conform to institutional standards. *Hetrick v. Martin*, 480 F.2d 705, 708 (6th Cir.), *cert. denied*, 414 U.S. 1075, 94 S.Ct. 592, 38 L.Ed.2d 482 (1973). The First Amendment concept of academic freedom does not require that a nontenured professor be made a sovereign unto himself. *See Lovelace v. Southeastern Mass. Univ.*, 793 F.2d 419, 426 (1st Cir.1986).

■ The university may dismiss a nontenured professor for any reason, or no reason, and the professor has no recourse unless such dismissal abridges his exercise of a constitutionally protected right. *See, e.g., Perry v. Sinderman*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Blair v. Board of Regents*, 496 F.2d 322 (6th Cir. 1974); *Orr v. Trinter*, 444 F.2d 128 (6th Cir.1971), *cert. denied*, 408 U.S. 943, 92 S.Ct. 2847, 33 L.Ed.2d 767 (1972). In addition, because the university must remain independent and autonomous to enjoy academic freedom, the federal courts are reluctant to interfere in the internal operations of the academy. *Cf. Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968) ("Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values.").

Although judicial concern has been expressed for the academic freedom of the university, the courts have also afforded substantial protection to the First Amendment freedoms of individual university professors. In *Sweezy v. New Hampshire*, 354 U.S. 234, 250, 77 S.Ct. 1203, 1211, 1 L.Ed.2d 1311 (1957), the Supreme Court concluded that "[t]eachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." Thus, "[t]hat a teacher does have First Amendment protection under certain circumstances cannot be denied." *Fowler v. Board of Educ.*, 819 F.2d 657, 662 (6th Cir.), *cert. denied*, — U.S. —, 108 S.Ct. 502, 98 L.Ed.2d 501 (1987).

The individual university professor may claim that his assignment of an examination grade or a final grade is communication protected by the First Amendment. As does any communicative act, assigning a letter grade sends a message to the recipient. The message communicated by the letter grade "A" is virtually indistinguishable from the message communicated by a formal written evaluation indicating "excellent work." Both communicative acts represent symbols that transmit a unique message.

■ Because the assignment of a letter grade is symbolic communication intended to send a specific message to the student, the individual professor's communicative act is entitled to some measure of First Amendment protection. *Cf. Tinker v. Des Moines Indep. Community School Dist.*, 393 U.S. 503, 505–06, 89 S.Ct. 733, 735–36, 21 L.Ed.2d 731 (1969) (holding that students' action, wearing black armbands, was expressive conduct entitled to First Amendment protection); *Brown v. Louisiana*, 383 U.S. 131, 141–42, 86 S.Ct. 719, 723–24, 15 L.Ed.2d 637 (1966) (concluding that a sit-in by black students was symbolic speech); *Monroe v. State Ct. of Fulton Cty.*, 739 F.2d 568, 561 (11th Cir.1984) ("If [plaintiff] shows '[a]n intent to convey [a] particularized message ... and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it,' the activity falls within the scope of the first and four-

teenth amendments." (quoting *Spence v. Washington,* 418 U.S. 405, 410–11, 94 S.Ct. 2727, 2730–31, 41 L.Ed.2d 842 (1974))).

The freedom of the university professor to assign grades according to his own professional judgment is of substantial importance to that professor. To effectively teach her students, the professor must initially evaluate their relative skills, abilities, and knowledge. The professor must then determine whether students have absorbed the course material; whether a new, more advanced topic should be introduced; or whether a review of the previous material must be undertaken. Thus, the professor's evaluation of her students and assignment of their grades is central to the professor's teaching method.

The professor's authority over grading was addressed by the Supreme Court in *Board of Curators of the Univ. of Mo. v. Horowitz,* 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978). The Court stated that "[l]ike the decision of an individual professor as to the proper grade for a student in his course, the determination of whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking." *Id.* at 90, 98 S.Ct. at 955. The court concluded that the professor should retain wide discretion in his evaluation of the academic performance of his students. *Id.* at 96, n. 6, 98 S.Ct. at 958, n. 6 (Powell, J., concurring).

Although the individual professor does not escape the reasonable review of university officials in the assignment of grades, she should remain free to decide, according to her own professional judgment, what grades to assign and what grades not to assign. In the context of protected speech, the difference between compelled speech and compelled silence "is without constitutional significance, for the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what not to say." *Riley v. National Fed'n. of the Blind of N.C.,* —— U.S. ——, 108 S.Ct. 2667, 2677, 101 L.Ed.2d 669 (1988) (invali-

dating a statute that required professional fund raisers to disclose administrative fees charged charities because the statute unconstitutionally compelled speech); *Keyishian v. Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967) (striking down loyalty oaths as a precondition to public employment on First Amendment grounds); *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 256, 94 S.Ct. 2831, 2839, 41 L.Ed.2d 730 (1974) (invalidating state statute that compelled a newspaper to print an editorial reply, and thus, exacted "a penalty on the basis of the content of [the] newspaper"); *Board of Educ. v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943) (invalidating mandatory educational requirement that the pledge of allegiance be recited). Thus, the individual professor may not be compelled, by university officials, to change a grade that the professor previously assigned to her student. Because the individual professor's assignment of a letter grade is protected speech, the university officials' action to compel the professor to alter that grade would severely burden a protected activity.

In *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), the Supreme Court held that an individual could not be compelled to display the slogan "Live Free or Die" on his automobile license plate. In so holding, the Court relied on the principle that "[t]he right to speak and the right to refrain from speaking are complementary components of the broader concept of 'individual freedom of mind.' " *Id.* at 714, 97 S.Ct. at 1435 (quoting *Barnette,* 319 U.S. at 637, 63 S.Ct. at 1185). Similarly, the university professor must remain free to exercise his independent professional judgment in the assignment of grades and the evaluation of his students' academic progress.

If the speech of a nontenured professor is compelled by a university administrator, then the professor is not without redress for this violation of her constitutional rights. If a nontenured professor claims that she was not rehired in violation of a First Amendment right, she must first es-

tablish that her conduct was constitutionally protected, and then that this conduct was the motivating factor in her not being rehired. *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

In the present appeal, we consider the claim of the individual professor, Parate. He argues that his First Amendment right to academic freedom was violated during the March 3, 1983, grading incident. The district court explained that Parate "bases his claim to be free in his assignment of grades on the First Amendment guarantee of academic freedom." *Parate v. Isibor*, No. 3-86-0311, slip op. at 7 (M.D.Tenn. Aug. 28, 1987). The district court then concluded "that a refusal to change a grade does not rise to the level of a constitutionally protected First Amendment right." *Id.* at 9. Thus, the district court construed Parate's claim as being based on a First Amendment right to see that Student "Y" ultimately received the "GWS" course grade that Parate originally assigned him, and the alleged constitutional infringement occurred when the grade was changed. However, based on the foregoing analysis, we conclude that the constitutional issue was mischaracterized below. The defendants' act of *ordering Parate* to change the grade, rather than the act of giving Student "Y" a different grade than Parate desired, gives rise to the constitutional violation.

The district court held that Parate's constitutional right to academic freedom does not permit him to override administrative authority; to ignore TSU grading policies; or to escape the supervision of the defendants over his grade assignments. In rebuttal, Parate correctly contends that even as a nontenured professor, he retains the right to review each of his students' work and to communicate, according to his own professional judgment, academic evaluations and traditional letter grades. Parate,

however, has no constitutional interest in the grades which his students ultimately receive. If the defendants had changed Student "Y's" "GSW" course grade, then Parate's First Amendment rights would not be at issue. Parate's First Amendment right to academic freedom was violated by the defendants because they ordered *Parate* to change Student "Y's" original grade. The actions of the defendants, who failed to administratively change Student "Y's" grade *themselves*, unconstitutionally compelled Parate's speech and precluded him from communicating his personal evaluation to Student "Y."[2] Thus, the district court misconstrued Parate's First Amendment claim.

Relying on *Hillis v. Stephen F. Austin State Univ.*, 665 F.2d 547 (5th Cir.), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982), the district court concluded that Parate's First Amendment claims should be dismissed. In *Hillis*, however, the plaintiff nontenured professor's contract was not renewed, in part, because he refused to give a student a "B" grade as directed by the head of his department. *See id.* at 549. Unlike the present defendants, the *Hillis* university administrators changed the student's grade. Unlike Parate, the *Hillis* professor was not forced, in violation of his own professional judgment, to personally change his student's grade. Because the *Hillis* professor's speech was not compelled in violation of the First Amendment, as was Parate's, the *Hillis* case is inapplicable here.

The district court next cited *Lovelace v. Southeastern Mass. Univ.*, 793 F.2d 419 (1st Cir.1986). In *Lovelace*, a nontenured professor contended that his grading policy was in accordance with the university's published criteria. The First Circuit, however, accepted the university's argument that the professor was justifiably discharged because his grading standards did not conform to institutional policy. *See id.*

---

2. On appeal, the defendants—Isibor, Samuchin, TSU, the TSU President, and the Chancellor of the Board of Regents—argue: (1) that they should be dismissed in their official capacities; and (2) that they are entitled to a grant of qualified immunity. Isibor and Samuchin contend that because their actions implicated no clearly defined and settled principles of law, the defense of qualified immunity is applicable. Because these arguments were not raised below, we believe that any remaining questions should be addressed by the district court on remand.

at 425–26. Unlike the *Lovelace* professor, Parate did not implement his own grading criteria. Parate was compelled to change his "GSW" course grade distribution policy to accomplish a grade change for Student "Y," a Nigerian student, favored by defendant Isibor, a Nigerian dean. Thus, this appeal, unlike the *Lovelace* case, is not a dispute over a nontenured professor's adherence to a university's published grading policy. This appeal is grounded in defendant Isibor's effort to compel a change in Parate's grading to favor Student "Y." Thus, *Lovelace* may also be distinguished from the present appeal.

The district court also relied on *Hetrick v. Martin*, 480 F.2d 705 (6th Cir.), *cert. denied*, 414 U.S. 1075, 94 S.Ct. 592, 38 L.Ed.2d 482 (1973). In *Hetrick*, this Court found that no First Amendment interests were implicated when a state university did not renew the contract of a nontenured professor because her pedagogical style and teaching methods did not conform to the university's standards. *See id.* at 708. In the present appeal, however, defendants did not try to alter Parate's pedagogical style, but compelled his speech by demanding that he change, against his own professional judgment, a grade previously assigned.

We believe that the acts of the defendants deserve *exacting* First Amendment scrutiny. First, we consider Parate's First Amendment right to academic freedom and his interest in eliminating the defendants' arbitrary interference in the assignment of his course grades. Second, we consider Parate's First Amendment right to be free from compelled speech. By insisting that Parate sign the grade change memoranda without including his reservations or the notation "per the instruction of the Dean," the defendants compelled Parate to conform to a belief and a communication to which he did not subscribe. We then balance Parate's interests against defendants' interest in having Parate personally change Student "Y's" grade. Arguing from their First Amendment right to academic freedom, the defendants assert an interest in supervising and reviewing the grading policies of their nontenured professors. If

they deemed Parate's grade assignments improper, however, the defendants could have achieved their goals by administratively changing Student "Y's" grade. We conclude that by forcing Parate to change, against his professional judgment, Student "Y's" grade, the defendants unconstitutionally compelled Parate's speech and chose a means to accomplish their supervisory goals that was unduly burdensome and constitutionally infirm.

## IV.

Parate next claims that the defendants' actions on October 4, 1985, violated his First Amendment right to academic freedom. Parate contends that the defendants not only precluded him from teaching his "Statics" course, but humiliated him before his students. Parate also alleges that because his contract had not been renewed prior to the classroom incident, the defendants did not intend to evaluate his teaching competence and illegitimately exercised their supervisory functions.

The district court found that the requisite test for evaluating the classroom incident is whether the defendants "cast a pall of orthodoxy over the classroom," and thereby violated Parate's First Amendment rights. *Keyishian*, 385 U.S. at 603, 87 S.Ct. at 683. We agree with the district court's conclusion that the defendants' actions on October 4, 1985, did not rise to the level of a constitutional violation.

 It has long been recognized that the purpose of academic freedom is to preserve the "free marketplace of ideas" and protect the individual professor's classroom method from the arbitrary interference of university officials. *See id.* University administrators, however, are free to observe, review or evaluate a nontenured professor's competence. *See e.g., Hetrick*, 480 F.2d at 709. Moreover, because public education in America is committed to the control of local and state authorities, the courts cannot intervene to resolve educational conflicts that do not "sharply implicate basic constitutional values." *Epperson*, 393 U.S. at 104, 89 S.Ct. at 270.

Although defendants' behavior was unprofessional, their actions on October 4, 1985, did not violate Parate's First Amendment right to academic freedom. First, Parate alleges that the defendants interfered with his classroom teaching on only one occasion. Thus, defendants' incidental conduct could not have resulted in a "pall of orthodoxy" being cast over Parate's "Statics" classroom. Second, Parate failed to allege that the defendants consistently denied him a free and open exchange with his students. Third, because Parate is a nontenured professor, he can allege no First Amendment right to teach a particular class or to be free from the supervision of university officials. *See, e.g., Hetrick,* 480 F.2d at 709.

As the district court correctly noted, the defendants' actions on October 4, 1985, rise at most to the level of a tort of defamation which is not cognizable under 42 U.S.C. § 1983. *See Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976).

## V.

In addition to his claims under the First Amendment, Parate raises a Fourteenth Amendment claim that the defendants arbitrarily and unreasonably interfered with his substantive due process liberty interest in the free and full pursuit of his profession as a TSU professor. Parate also contends that the defendants maliciously, unreasonably, and arbitrarily terminated his employment with TSU in violation of his Fourteenth Amendment rights. We agree, however, with the district court's conclusion that Parate's claims under the Fourteenth Amendment guarantee of substantive due process should be dismissed.

This Court has long held that the "freedom to choose and pursue a career, 'to engage in any of the common occupations of life,' *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923), qualifies as a liberty interest which may not be arbitrarily denied by the State." *Wilkerson v. Johnson,* 699 F.2d 325, 328 (6th Cir.1983). In *Wilson v. Beebe,* 770 F.2d 578, 583–586 (6th Cir.1985), two types

of substantive due process violations were enumerated: (1) official acts that are unreasonable, arbitrary and cause a deprivation of a substantive right specified in the Constitution, or (2) official acts that " 'may not take place no matter what procedural protections accompany them.' " *See id.* at 586 (quoting *Hudson v. Palmer,* 468 U.S. 517, 541 n. 4, 104 S.Ct. 3194, 3208 n. 4, 82 L.Ed.2d 393 (1984) (opinion of Stevens, J.)). *See also Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952) (identifying an official act that "shocks the conscience").

The district court considered two additional factors in analyzing Parate's claim that the defendants interfered with his freedom to pursue an occupation; (1) the nature and seriousness of the alleged governmental interference; and (2) the strength of the justification given. *See Wilkerson,* 699 F.2d at 328. The district court rejected Parate's claim and found that, as a nontenured professor, he was subject to discharge without cause and was justifiably terminated at the end of his one-year contract. Parate was not denied the choice of his career, but remains free to pursue his chosen profession at another university. Moreover, Parate has failed to demonstrate that the defendants brought false charges against him that "might seriously damage his standing and associations in his community" or that impose a "stigma or other disability" that prevents him from securing other employment. *Board of Regents v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972).

On appeal, Parate argues that the district court erred by concluding that Parate has no substantive due process right in the pursuit of his chosen occupation. To support this contention, Parate relies on *Wilkerson,* 699 F.2d 325. In that case the plaintiff applicants were denied an opportunity to enter the barbering profession by operation of state law. *See id.* at 326–27. *Wilkerson,* however, did not involve the application of rules and regulations to individuals presently engaged in their chosen profession. *See id.* at 327. *Wilkerson* precluded individuals from *entering a profession,*

and thus, may be distinguished from the present appeal, which involves the regulation of an individual's conduct while *engaged in the profession*. In addition, the *Wilkerson* plaintiff applicants could not practice as barbers anywhere in the state. *See id.* By contrast, Parate has only been discharged from *one* state university.

Parate also erroneously relies on *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), where the Supreme Court held that state action prohibiting the teaching of German in public schools violated a German teacher's Fourteenth Amendment right to pursue the common occupations of life. *See id.* at 400, 43 S.Ct. at 627. *Meyer*, however, is distinguishable from the present appeal. In *Meyer*, the plaintiff was precluded by state law from teaching German at any school in the state. In the present appeal, Parate has been precluded from teaching at only one state university, TSU. He can pursue the teaching profession at any public or private university that requests his services.

In *Sullivan v. Brown*, 544 F.2d 279 (6th Cir.1976), this Court held that the transfer of a tenured teacher did not implicate her liberty interest under the Fourteenth Amendment because no constitutional right to teach a specific class exists. Thus, Parate cannot claim a Fourteenth Amendment right to teach at TSU; nor can he claim a constitutional right to teach a specific class. When the defendants removed Parate from the "Statics" class, no constitutional violation occurred.

Parate also argues that the defendants failed to justify the non-renewal of his teaching contract. Because Parate was a nontenured TSU professor, the defendants contend that the expiration of his one-year contract was sufficient to justify his termination. The defendants also argue that Parate's termination was completely within the bounds of his employment contract. Because Parate's termination at TSU did not preclude him from securing other employment, we agree with the district court's conclusion that Parate has failed to prove a substantial due process violation under the *Wilkerson* standards.

Parate next argues that a liberty interest may be created by state regulations or administrative rules that place substantive limits on official discretion. *See Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *Spruytte v. Walters*, 753 F.2d 498 (6th Cir.1985), *cert. denied*, 474 U.S. 1054, 106 S.Ct. 788, 88 L.Ed.2d 767 (1986). He then posits the Tennessee Board of Regents' Policy, No. 5:02:03:00, which states that " '[t]he faculty member is entitled to freedom in the classroom in discussing his or her subject, being careful not to introduce into the teaching controversial matter which has no relation to the subject....' " *Id.*, *quoted in* Brief of Plaintiff–Appellant at 33. Parate next contends that the Board of Regents' policy statement creates a liberty interest protected by the Fourteenth Amendment. Parate concludes that the defendants severely burdened this liberty interest when they berated him before his students and removed him from his "Statics" class.

In *Washington v. Starke*, 855 F.2d 346 (6th Cir.1988), this Court concluded that:

In determining whether state-enacted rules create a protected liberty interest, the key is "whether or not the state has imposed 'substantive limitations' on the discretion of [officers] ... or, in other words, whether the state has used language of an unmistakably mandatory character." The *mandatory* nature of the regulation is the key, as a plaintiff "must have a legitimate claim of entitlement to the interest, not simply a unilateral expectation of it."

*Id.* at 349 (citations omitted). In the present appeal, the language of the Regents' policy statement is not of a mandatory character, but merely articulates broadly stated TSU goals. Because we have determined that the Regents' policy statement is not sufficiently mandatory to establish a liberty interest, we find Parate's arguments unpersuasive.

Parate finally contends that the defendants' actions so "shock the conscience" that they constituted official acts that are unconstitutional regardless of the procedural protections provided. *See Wilson*,

770 F.2d at 586. This Court has held, however, that "[a] citizen does not suffer a constitutional deprivation every time he is subject to the petty harassment of a state agent." *Vasquez v. City of Hamtramck*, 757 F.2d 771, 773 (6th Cir.1985). Moreover, Parate has failed to prove that the defendants' conduct on October 4, 1985, was so severe, so disproportionate to the need presented, and such an abuse of authority "as to transcend the bounds of ordinary tort law and establish a deprivation of constitutional rights." *McClary v. O'Hare*, 786 F.2d 83, 88 (2d Cir.1986). We, therefore, agree with the district court's characterization of the defendants' behavior as unprofessional, but we find no deprivation of Parate's right to substantive due process.

### VI.

On appeal, Parate claims that the district court wrongly denied his application for preliminary injunction. Parate has failed, however, to demonstrate why his remedies at law would be inadequate. Because almost two years have passed since Parate was employed at TSU, his request for a preliminary injunction to prevent his dismissal and maintain the status quo is moot. *See Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 1950, 23 L.Ed.2d 491 (1969); *Carras v. Williams*, 807 F.2d 1286, 1289 (6th Cir.1986).

### VII.

After careful review of the record, we reverse the judgment of the district court dismissing Parate's First Amendment claims resulting from the March 3, 1983, grading incident. On this issue, we remand to determine damages and whether Parate was discharged due to the exercise of his First Amendment right to academic freedom. We affirm the judgment of the district court dismissing Parate's First Amendment claims resulting from the October 4, 1985, classroom incident; dismissing his Fourteenth Amendment claims; and denying his application for a preliminary injunction.

Accordingly, the judgment of the district court is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.