*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name:  05a0389p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ROSEMARY JOHNSON-KUREK,

   *Plaintiff-Appellant,*

  *v.*

           No. 04-4502

SAMIR ABU-ABSI; THOMAS BARDEN; and CAROL
NELSON-BURNS,

   *Defendants-Appellees.*

---

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 03-07500—James Gwin, District Judge.

Argued:  August 9, 2005

Decided and Filed:  September 13, 2005

Before:  BOGGS, Chief Judge; SUTTON, Circuit Judge; and RICE, District Judge.[*]

---

## COUNSEL

**ARGUED:** Thomas A. Sobecki, Toledo, Ohio, for Appellant.  Anastasia Kay Hanson, SPENGLER
NATHANSON, Toledo, Ohio, for Appellees.  **ON BRIEF:**  Thomas A. Sobecki, Toledo, Ohio, for
Appellant.  Anastasia Kay Hanson, Theodore M. Rowen, SPENGLER NATHANSON, Toledo,
Ohio, for Appellees.

---

## OPINION

---

  BOGGS, Chief Judge.  Rosemary Johnson-Kurek appeals the district court's dismissal of her
claims under 42 U.S.C. § 1983 against Samir Abu-Absi, Thomas Barden, and Carol Nelson-Burns,
tenured faculty members of the University of Toledo.  Johnson-Kurek, then a part-time lecturer in
the Department of English and the Department of Theater and Film at the University of Toledo,
alleged that her First Amendment rights to free speech and academic freedom were violated when
the English Department denied her a second class to teach in the Fall semester of 2001, in retaliation
for her refusal to comply with a request that she communicate more clearly to her students what was
required to complete the coursework in a class she taught in the Fall of 2000.  Holding that a

---

[*]The Honorable Walter H. Rice, United States District Judge for the Southern District of Ohio, sitting by
designation.

university may constitutionally require a lecturer to provide detailed advice to students about the administrative aspects of a course, we affirm the judgment of the district court.

**I**

This case arose in the Spring of 2001, when a student in Johnson-Kurek's organizational writing class the previous Fall complained to English Department Professor Jane Bradley that Johnson-Kurek had refused to explain to him what he needed to do in order to convert his grade of "incomplete" to a final course grade. It turned out that Johnson-Kurek had given an incomplete to thirteen of the seventeen students in that class because their work was substandard. She had posted a message on an automatic mailing list service ("listserv") for the course, stating that these incomplete grades had each been assigned for one or more of three reasons (proper formatting, proper citations, and/or textual changes), but left it up to each student to determine which of these reasons applied to his or her own case. The posting explained how and when revised assignments should be handed in, and warned that any textual (as opposed to formatting) revisions to assignments were to receive pre-clearance from Johnson-Kurek. A subsequent posting on the same listserv expanded slightly on the reason for several of the incompletes, namely poor citation of authority, but did not specify which students had received an incomplete for that particular reason. Johnson-Kurek stated in one of these messages that she had "very sound and ethical reasons for not providing students with specific, individual guidance on how to correct their texts," and claimed in her complaint that writing individualized letters would have interfered with the students' learning experience and the purpose of the class.

Professor Bradley forwarded the student's request to Carol Nelson-Burns, the Director of Technical Writing in the Department of English and Johnson-Kurek's immediate supervisor, who told Johnson-Kurek that her listserv postings about the incompletes were not sufficiently clear for the students to know what to do to complete the course, and requested that she prepare letters to each student containing individualized instructions for obtaining a final grade in the course. In a memo to Johnson-Kurek memorializing the meeting, Nelson-Burns summarized her request as follows:

> As we discussed, a more specific statement needs to be prepared for *each* student and *each* student needs to be told specifically what he or she must do to finish the coursework and earn a grade. Please note that although your instructions in those published messages may seem clear, a given student may still be confused as to what is expected of him or her personally. Please draft those statements and share them with me before forwarding them to students.

(emphasis in original).

Five weeks later, after receiving additional complaints that Johnson-Kurek had not provided any additional information to the students, Nelson-Burns repeated her request that Johnson-Kurek provide her with draft letters to each student, and emphasized that the continuing incompletes were a serious problem for the involved students because the grades affected their GPA and their financial aid status. Johnson-Kurek did not respond to this renewed request, nor to a series of phone calls and mailbox notes. In the end, Nelson-Burns had to wait outside Johnson-Kurek's classroom to speak with her before class. Johnson-Kurek never prepared the requested letters.

Johnson-Kurek complained to Samir Abu-Absi, Chair of the Department of English, about Nelson-Burns, but he refused to intervene. She also complained to Thomas Barden, Associate Dean for Humanities in the College of Arts and Sciences, who told Johnson-Kurek that she could not file a grievance because she was not a member of a bargaining unit recognized by the University.

During the Fall semester of 2001, Johnson-Kurek taught one course in the Department of English and two courses in the Department of Theater and Film. Abu-Absi, Barden, and Nelson-

Burns claim that Johnson-Kurek was offered a second class by the English Department on at least two occasions, but turned it down each time due to scheduling conflicts. Johnson-Kurek claims that a second class was withheld by the Department of English in retaliation for her refusal to cooperate with Nelson-Burns's requests regarding the incompletes. It was suggested during oral argument by counsel for Johnson-Kurek that the Department of English may have refused to work around Johnson-Kurek's schedule as a result of the dispute.

Johnson-Kurek filed suit against Abu-Absi, Barden, and Nelson-Burns in August 2003, alleging that her First Amendment rights to free speech and academic freedom were violated when she was instructed by Nelson-Burns to send letters to her students, and when Abu-Absi "took no action" in response to her complaint about Nelson-Burns's instruction, and denied her a second class for the Fall semester. She also alleged that her Fourteenth Amendment rights were violated when Barden advised her that she had no right to file a grievance because she was not a member of a bargaining unit.

The district court dismissed Johnson-Kurek's claims against all three defendants for lack of subject matter jurisdiction, on Eleventh Amendment and qualified immunity grounds; for failure to state a claim; and, in the case of her claims against Nelson-Burns, as time-barred. On appeal, Johnson-Kurek raises two issues. First, she argues that the district court erred by holding that she had failed to present any evidence that her constitutional rights were violated by the alleged attempts of all three defendants to force her to write to her students, a holding that underpinned the dismissal of her claims for failure to state a claim and on qualified immunity grounds. Second, she argues that the district court erred by refusing to allow her to amend her complaint to specify more clearly that her due process claim against Barden was predicated on her interests in freedom of speech and academic freedom.

## II

Johnson-Kurek argues that her First Amendment rights were violated when she was asked to communicate with her students by Nelson-Burns, and when she was denied a second class to teach as a result of her refusal. We disagree.

"[T]o the extent the Constitution recognizes any right of 'academic freedom' above and beyond the First Amendment rights to which every citizen is entitled, the right inheres in the University, not in individual professors." *Urofsky v. Gilmore*, 216 F.3d 401, 410 (4th Cir. 2000); *see also Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring) (describing the "four essential freedoms of a university": "to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study."). "Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values." *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968); *see also Parate v. Isibor*, 868 F.2d 821, 827 (6th Cir. 1989) ("The administration of the university rests not with the courts, but with the administrators of the institution.").

These "essential freedoms" of a university encompass the right to determine how classes are to be taught, and grades assigned:

> A nontenured professor does not escape reasonable supervision in the manner in which she conducts her classes or assigns her grades. University officials remain free to review a professor's classroom activities when determining whether to grant or deny tenure. The university may constitutionally choose not to renew the contract of a nontenured professor whose pedagogical attitude and teaching methods do not conform to institutional standards. The First Amendment concept of academic

freedom does not require that a nontenured professor be made a sovereign unto himself.

*Parate*, 868 F.2d at 827 (internal citations omitted); *see also Brown v. Armenti*, 247 F.3d 69, 75 (3d Cir. 2001) ("Because grading is pedagogic, the assignment of the grade is subsumed under the university's freedom to determine how a course is to be taught. We therefore conclude that a public university professor does not have a First Amendment right to expression via the school's grade assignment procedures.").

This is not to say that professors must leave their First Amendment rights at the campus gates. "[T]hat a teacher does have First Amendment protection under certain circumstances cannot be denied." *Parate*, 868 F.2d at 827 (quoting *Fowler v. Board of Educ.*, 819 F.2d 657, 662 (6th Cir.), *cert. denied*, 484 U.S. 986 (1987)); *see also Piarowski v. Ill. Cmty. Coll. Dist. 515*, 759 F.2d 625, 629 (7th Cir.), *cert. denied*, 474 U.S. 1007 (1985) (the term academic freedom "is used to denote both the freedom of the academy to pursue its end without interference from the government . . . and the freedom of the individual teacher . . . to pursue his ends without interference from the academy . . . ."). For example, there are limits on the extent to which a university may require a professor to endorse actively the university's decisions about pedagogy and grading. In *Parate*, we considered the case of a non-tenured associate professor at Tennessee State University, who was required by the University to change the grade of a student from a "B" to an "A." *See* 868 F.2d at 824. Although the University could have changed the grade by fiat without involving Parate, Parate was required not only to change the grade himself, but to sign a memorandum stating that he had amended the grading policy for the class in a way that would retroactively justify the change of grade. *Ibid.* Parate did sign such a memorandum, but added a notation to the effect that the change was made at the instruction of the Dean. When instructed to sign a clean copy of the memorandum without adding any notation, he refused, and, as a result, his contract was not renewed the following year. *Ibid.* We held that the requirement that Parate personally sanction the change of grade by signing the memorandum violated his rights to free speech and academic freedom. *Ibid.*

Our concern in *Parete* was not with the University's insistence that the grade be changed, but only with the insistence that Parete himself make and endorse that change. A professor's own evaluation of a student's work, and the grade that he or she decides to assign to reflect that evaluation is an important part of a professor's teaching method. *Id.* at 828. The grade that is affixed to a student's transcript, however, is the concern of the university. *See id.* at 830 ("If [the University] deemed Parate's grade assignments improper, however, the defendants could have achieved their goals by administratively changing [the student's] grade."). In other words, the university may override the professor's evaluation, and change the assigned grade. It may not require him to publicly endorse those changes.

In this case, Johnson-Kurek's First Amendment rights were not implicated, still less violated, by Nelson-Burns's request that she explain to her students the precise requirements for obtaining a final grade in her class. She was not required to communicate the ideas or evaluations of others as if they were her own. She was not even told what grades to assign her students, or what the requirements for completing the class should be. She was simply required, as one might be in preparing a syllabus, to spell out in detail the requirements she had devised. While the First Amendment may protect Johnson-Kurek's right to express her ideas about pedagogy, it does not require that the university permit her to teach her classes in accordance with those ideas. The freedom of a university to decide what may be taught and how it shall be taught would be

meaningless if a professor were entitled to refuse to comply with university requirements whenever they conflict with his or her teaching philosophy.[1]

### III

In order to succeed on a section 1983 claim, Johnson-Kurek had to prove that the defendants (1) acted under color of law, and (2) deprived her of her rights under the Constitution or laws of the United States. *See Upsher v. Grosse Pointe Pub. Sch. Sys.*, 285 F.3d 448, 452 (6th Cir. 2002). It is undisputed that all three defendants, as public officials, acted under color of state law. As the district court correctly held, however, Johnson-Kurek failed to identify any violation of her constitutional rights as a result of the alleged efforts of each defendant to force her to write to her students. As explained above, Nelson-Burns's request that she write to her students did not implicate Johnson-Kurek's First Amendment rights. Nor, *a fortiori*, did Abu-Absi's failure to intercede on Johnson-Kurek's behalf in her dispute with Nelson-Burns, nor his alleged refusal to give her a second class to teach as a result of that dispute. Although the non-renewal of the contract of a non-tenured instructor at a public university may not be predicated on his or her exercise of First Amendment rights, *see Perry v. Sindermann*, 408 U.S. 593, 598 (1972), Johnson-Kurek was not exercising her First Amendment rights by refusing to comply with Nelson-Burns's request. Finally, Johnson-Kurek's failure to allege a violation of her First Amendment rights renders moot her claim that she should have been permitted to amend her complaint to make clear that her Fourteenth Amendment claims against Barden were predicated on the alleged violation of her First Amendment rights by Nelson-Burns and Abu-Absi, about which she wished to file a grievance.

Because we hold that the district court properly dismissed Johnson-Kurek's complaint for failure to state a claim, we need not address the alternative grounds given by the district court for dismissing her complaint.

### IV

For the reasons discussed above, we AFFIRM the judgment of the district court.

---

[1] Ironically, the aspect of Nelson-Burns's request that Johnson-Kurek found most objectionable – that she would have to identify for each student the shortcomings and errors in his or her assignment, and explain how to improve and correct them – seems to have been her own fault. It was only because she assigned grades of incomplete to work that was not incomplete in the sense of being partially finished, but was simply of poor quality, that her explanations of how to pass the class had to touch on the substantive aspects of the course.