Carl KEEN, Plaintiff–Appellant,

v.

Edward M. PENSON, individually and in his capacity as Chancellor of the University of Wisconsin–Oshkosh, a subdivision of the University of Wisconsin System, Defendant–Appellee.

No. 91–2871.

United States Court of Appeals, Seventh Circuit.

Argued March 3, 1992.

Decided July 16, 1992.

John S. Williamson, Jr., argued, Appleton, Wis., for plaintiff-appellant.

Daniel S. Farwell, Office of the Atty. Gen., Wisconsin Dept. of Justice, Madison, Wis., Nadim Sahar, Asst. Atty. Gen., argued, Wisconsin Dept. of Justice, Milwaukee, Wis., for Edward M. Penson.

Before CUMMINGS, CUDAHY, and COFFEY, Circuit Judges.

CUMMINGS, Circuit Judge.

Plaintiff Carl Keen, a professor at the University of Wisconsin–Oshkosh ("UW–Oshkosh"), spent the summer of 1985 attempting to force a "proper" apology from a former student for several comments she made in class, and one comment she made

before class. Ironically, Keen now complains because the defendant, UW–Oshkosh Chancellor Edward M. Penson, ordered him to write a letter of apology to the student as well as change the student's grade, which he refused to do. Penson eventually demoted Keen from associate professor to assistant professor, and reduced his salary by $700 a year. Keen sued Penson, claiming a violation of his First and Fourteenth Amendment rights to academic freedom and his Fourteenth Amendment right to procedural due process. The district court granted Penson's motion for summary judgment. We affirm.

## I. FACTS

Kathleen Johnson, then a sophomore at UW–Oshkosh, enrolled in Keen's English 226 course entitled Modern American Literature for the Spring 1985 semester. The syllabus for the class noted that spot quizzes accounted for 20% of the grade, and that a so-called optional book report accounted for 10% of the grade. The syllabus also asked for student questions and comments at the beginning of every class. Johnson did not like spot quizzes, and complained of their unfairness on two or three occasions at the beginning of class when they were administered. Johnson also understandably thought it unusual to label as "optional" a book report that was not treated as extra credit but rather was treated the same as other, "mandatory" assignments. She complained about this to another student before class and was apparently overheard by Keen.

Keen believed that Johnson created a negative atmosphere in his class and that her comments were unfair. Keen also thought that Johnson was overly grade-conscious. The disagreement between Keen and Johnson apparently reached a head at two end-of-semester conferences in May 1985. At the first conference, Keen told Johnson that he had tentatively assigned her a "C" grade. They scheduled a second conference,[1] but Johnson returned

to Keen's office prior to the scheduled time of the second conference. Johnson did not attend the scheduled second conference, believing that the second meeting obviated its need. Keen apparently disagreed, and submitted a grade of "Incomplete" for Johnson.

In a June telephone conversation with Johnson, Keen made it clear that he would not submit a grade for her until he received an appropriate apology, to him and to all class members, for her conduct in his class. A series of letters between Johnson and Keen followed, in which Johnson's apologies were repeatedly deemed unacceptable by Keen. Summaries of these letters do not capture their complete flavor. The Appendix to this opinion contains an edited version of the summer correspondence. This correspondence presents, at the very least, substantial evidence of Keen's unprofessional behavior.

Following a heated telephone conversation in August 1985 with Richard Johnson, Kathleen's father, Keen sent yet another letter (2 pages long) to him, which was similar in tone to his previous letters. Keen finally assigned Johnson a grade of "F" on September 5, 1985, because he gave her a "0" grade for class participation. Keen did not think any other student in the class had received less than a "70" for class participation. After unsuccessfully appealing within the English Department, Richard Johnson wrote a letter of complaint to Chancellor Penson. In the letter, Richard complained about the "F" grade his daughter received as well as the unprofessional, insulting, degrading, and intimidating letters that Keen had sent to his daughter. Penson responded to Richard's complaint by asking Professor John Lucas to conduct an independent investigation and make recommendations. Lucas' report, as well as subsequent hearings concerning the Keen–Johnson dispute, are summarized below.

---

1. The record is unclear why a second conference was necessary. Keen asserts that it was because Johnson failed to bring the required papers to the first conference. Evidence in the record suggests that they simply ran out of time.

## THE HEARINGS

### 1. *Professor John Lucas*

Lucas, a faculty rights advocate who was surprised by Penson's request that he serve as his designate, talked with Keen for twenty minutes on the phone, and then met with him for an hour with another professor present at Keen's request. The purpose of the meeting was to discuss the complaint and give Keen an opportunity to respond to the charges. As part of his investigation, Lucas also interviewed several professors in the English Department and Richard and Kathleen Johnson. He examined the summer correspondence discussed above as well as other documents. In a 6–page report with two pages of addenda, Lucas made the following conclusions:

A. Dr. Keen's syllabus for English 226, spring, 1985 was both unclear and incomplete. * * * [N]owhere in the syllabus is the end-of-semester conference required. * * * Finally, Dr. Keen specifically states that he will take Kathy Johnson's correspondence in this matter "... Into account for determining your final grade." Later, Dr. Keen implies that Ms. Johnson's noncooperation in answering a list of 26 questions constitutes an "unscholarly and objectionable" attitude, implying that this was a new course requirement for her to complete. In my opinion, these latter demands were unreasonable and not specified in the syllabus as requirements of the course.

\* \* \* \* \* \*

C. * * * [B]y changing Kathy Johnson's grade to an "F," judging that she deserved a 0% for class participation (which resulted in the "F") and justifying that decision (0%) on the basis that Ms. Johnson has a bad attitude and failed to fulfill the "goal" of the course [the search for truth] (which itself was not specified in the course syllabus), Dr. Keen is in effect grading Ms. Johnson ex post facto, based on new criteria which surfaced in the last week of

the course, and which was not clearly specified in his syllabus.

D. It is my opinion that the correspondence of Dr. Keen contains statements too numerous to mention specifically here, which are unwarranted, personally demeaning to the intended reader, overbearing, unforgiving, and relentless. At the very least, many of these statements are unprofessional; at worst, they are libelous. The general tone of his letters is one of verbal harassment. In either case, they should not have been written by a faculty member. * * *

\* \* \* \* \* \*

[M]y recommendation to you, Chancellor Penson, is to invoke administrative disciplinary action against Dr. Carl Keen in the form of a sanction, at least at the level of requirement for restitution. Such restitution should be in the form of a written apology to both Ms. Kathleen Johnson and her father, Mr. Dick Johnson, *and* a grade change from "F" to, at least, "C," for English 226, spring, 1985.

Should Dr. Keen choose not to make this restitution, I would then recommend that dismissal action be taken against him. * * * [2]

Penson wrote a letter to Keen on October 8, 1985, informing him that he had received Lucas' report and inviting him to meet with him if he wished to discuss the matter. Keen wrote Penson a four-page letter dated October 12, 1985, repeating his side of the story. On October 29, 1985, Penson accepted Lucas' recommendations and invoked the sanctions contained therein (apology and grade change). Penson's letter informing Keen of this decision also noted that Keen had ten working days to request a review by a faculty hearing subcommittee. Keen refused to comply with the sanctions, and instead requested a hearing.

---

2. Lucas' report also noted that Johnson had earned a 3.93 grade point average at UW–Oshkosh up to that point and was generally considered a top student at the University.

### 2. Professor Robert Havens' Subcommittee

A chairperson and four committee members for the faculty hearing subcommittee were chosen randomly from a list of faculty members who had agreed to serve on the committee. Professor Robert Havens was selected as chairperson of the subcommittee. Keen, along with his representative, a fellow professor, appeared at an organizational meeting of the subcommittee held January 9, 1986, and participated in the subcommittee's discussions concerning procedural and organizational matters. Keen submitted numerous documents to the subcommittee prior to its decision on the merits. He also sent several letters to the subcommittee in support of his position.

At the hearing, Keen had the right to present testimony in his behalf, to offer witnesses, to cross-examine adverse witnesses, and the right to be represented by counsel. He in fact presented several witnesses, submitted affidavits, and cross-examined adverse witnesses, but decided not to have an attorney present at the hearing. The hearing took place on January 16, 1986, and lasted approximately seven hours. Keen submitted another written statement after the hearing on January 23, 1986, similar in nature to proposed findings of fact and conclusions of law. On February 6, 1986, the Havens subcommittee issued a 6–page report, which, after discussing several procedural issues, made the following findings and recommendations:

> It is the recommendation of the subcommittee that, since Ms. Kathy Johnson earned a grade of C, the first component of the sanction of October 29, 1985 is appropriate and that Dr. Keen be instructed to assign a grade of C for Ms. Kathy Johnson * * *.

> Taken as a whole and without trying to analyze individual written paragraphs or sentences and without trying to use terms such as insulting or critical thinking to describe portions of this communication, the subcommittee finds that Dr. Keen conducted a verbal interchange

with the Johnsons which can at best be described as inappropriate. * * *

> The subcommittee recommends that the Chancellor's second restitution sanction is appropriate and that Dr. Keen send a letter of apology to Ms. Kathy Johnson and Mr. Richard Johnson.

The subcommittee also recommended that more severe sanctions be imposed if Keen failed to change Johnson's grade and write a letter of apology.

Penson accepted these recommendations and wrote a letter to Keen on February 19, 1986, requesting that he carry them out. By letter dated March 17, 1986, Keen informed Penson that he would not change Johnson's grade or apologize to her and her father. Penson therefore followed the recommendation of the subcommittee and, effective April 1, 1986, demoted Keen from associate professor to assistant professor and reduced his salary by $700 annually. On April 16, 1986, Keen wrote a letter to the Faculty Senate Executive Committee and requested a hearing on his reduction of rank and salary.

### 3. Professor M.A. Rouf's Subcommittee

A new faculty hearing subcommittee chaired by Professor M.A. Rouf was formed to hear Keen's second appeal, because it was feared that Havens' subcommittee might not be impartial. After two organizational meetings, the subcommittee met on September 26, 1986, for a hearing on the Keen–Johnson matter. Keen had notice of both organizational meetings and the hearing, but did not attend them. Although Keen's letter was apparently past the deadline for appealing Penson's March 31 decision, Penson agreed to waive a timeliness objection in the interest of due process. On October 3, 1986, the subcommittee issued a 2–page written report that concluded that Penson's sanctions were appropriate and reasonable.

Once again out of respect for Keen's due process rights, Penson asked Rouf's subcommittee to reconvene and reconsider the

matter.[3] With one new member, the subcommittee did just that. At a new hearing on November 25, 1986, Keen appeared represented by counsel. He presented a number of documents to the subcommittee for review. Keen also had the right to present witnesses and cross-examine any adverse witnesses. The subcommittee issued its 6-page final report on December 12, 1986, which contained the following relevant findings and recommendations:

This committee was persuaded that to impose sanctions upon Professor Keen for his refusal to change a grade which, if wrong, could be changed administratively would serve little purpose. * * * This committee believes that, if Professor Keen's behavior had been unprofessional, it would have been more appropriate for the Chancellor or someone delegated by the Chancellor to express to the Johnsons the sincere regret of the university community. While a letter of apology from Professor Keen would probably have been helpful, Professor Keen has stated that he believes he had done no wrong. Therefore, any letter from him to the Johnsons would have been seen as insincere and of little value. The university community would be poorly served by the threat to impose sanctions which, if needed, would only have the effect of providing form without substance to any restitution.

    *    *    *    *    *    *

The committee found, by a 5–0 vote, that Professor Keen's behavior in this case was a serious violation of professional conduct; this committee has found the sanction of reduction in rank and salary to be appropriate. * * * In the "Statement of Professional Ethics" approved by the Council of the American Association of University Professors, April, 1966, and also included in [UW–Oshkosh Rules] Chapter 8, it is asserted that,

"As a teacher, the professor encourages the free pursuit of learning in his students. He holds before them the best scholarly standards of his discipline. He demonstrates respect for the student as an individual, and adheres to his proper role as intellectual guide and counselor. He makes every reasonable effort to foster honest academic conduct and to assure that his evaluation of students reflects their true merit."

The committee believes that Professor Keen seriously violated that standard when (1) he assigned a grade of "F" to Ms. Johnson in the course 38–226 when the evidence available to him clearly indicated that she had completed what was required of her by the syllabus, (2) when he required, as a condition of receiving a passing grade in the course, that she write letter after letter of apology until she had apologized in a way acceptable to Professor Keen, and (3) he evaluated her character and attitude in a manner that was not respectful of her as a person.

On January 12, 1987, Penson informed Keen of his acceptance of the subcommittee's findings and recommendations. Keen formally requested review of this decision by the Board of Regents on January 30, 1987.

### 4. Board of Regents' Review

A three-person committee appointed by the Regent President held a hearing on June 4, 1987, at which time Keen through his attorney argued that the Board should undertake a formal review process. The Regent Committee issued a thorough 12-page memorandum on July 10, 1987, that recommended that the Board not exercise its right to review the matter further. The Board accepted this recommendation on the same date and declined to review the case on the record.

## II. DISTRICT COURT PROCEEDINGS

On August 20, 1987, Keen filed a complaint under 42 U.S.C. Section 1983 alleging that Penson had violated Keen's rights under the First and Fourteenth Amendments

---

**3.** Penson was concerned because Keen, although given notice of the proceedings, had not been specifically invited to participate.

and his rights under Chapter 36 of the Wisconsin Statutes (governing the University of Wisconsin system). The district court, in an oral opinion, granted Penson's motion for summary judgment on July 31, 1991. Judge Stadtmueller concluded that "Professor Keen in this court's view has been afforded exemplary due process; indeed, much more due process than even the most violent recidivist sitting on death row has been afforded in terms of the criminal justice system" (Appellant's App. at 23). The judge added, "I have no alternative other than to reject outright Professor Keen's suggestion of lack of impartiality" (*Id.* at 24). Regarding the First Amendment claim, the judge first concluded, citing *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and *Breuer v. Hart*, 909 F.2d 1035 (7th Cir.1990), that Keen's letters were not protected by the First Amendment because they did not address matters of public concern. The judge also held that the giving of a grade is not protected by the principle of academic freedom. Finally, Judge Stadtmueller stated that he did not need to reach the issue of whether Penson could force Keen to apologize against his will because it was clear the University had the power to administer the punishment (reduction of rank and salary) that was ultimately rendered.

## III. DISCUSSION

Perhaps because of the academic setting from which it arose, this case has generated an unusual number of hearings and thoughtful written and oral decisions. There is perhaps little this Court can add regarding this dispute that has not already been stated in one form or another. We have cited the record, which includes the Keen–Johnson "summer correspondence" and the reports of the various reviewing committees, in some detail because it vividly supports two conclusions. First, Keen abused his power as a professor in his dealings with his former student and deserves sanctions. Second, Keen received (as the district court noted) an extraordi-nary amount of process, probably more than was due.

On appeal, Keen argues that he cannot be punished for the letters he wrote to Johnson and the grade he gave her because they are protected by the First Amendment under the concept of academic freedom. Academic freedom prohibits state actions that "cast a pall of orthodoxy over the classroom," which is traditionally the "marketplace of ideas." *Keyishian v. Board of Regents*, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967). As this case reveals, the asserted academic freedom of a professor can conflict with the academic freedom of the university to make decisions affecting that professor. *Regents of University of Michigan v. Ewing*, 474 U.S. 214, 226 n. 12, 106 S.Ct. 507, 514 n. 12, 88 L.Ed.2d 523 (1985); *Piarowski v. Illinois Community College District 515*, 759 F.2d 625, 629 (7th Cir.1985), certiorari denied, 474 U.S. 1007, 106 S.Ct. 528, 88 L.Ed.2d 460 (1985). This Court has recognized the supremacy of the academic institution in matters of curriculum content. *Clark v. Holmes*, 474 F.2d 928 (7th Cir.1972), certiorari denied, 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695 (1973); *Palmer v. Board of Educ. of City of Chicago*, 603 F.2d 1271 (7th Cir.1979), certiorari denied, 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 659 (1980). As noted in *Clark*, "we do not conceive academic freedom to be a license for uncontrolled expression * * * internally destructive of the proper functioning of the institution." 474 F.2d at 931.

It is difficult to see what matters of public concern are implicated by Keen's letters to Johnson (the purpose of which was to extract an apology from Johnson) and by the "F" grade he eventually gave her for not appropriately apologizing. Cf. *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (discussion of government office administration procedures not protected by First Amendment); *Clark*, 474 F.2d at 931 (Clark's "disputes with his superiors and colleagues were not 'matters of public concern' and involved Clark as a teacher rather than as an interested citizen."). Even if we were to as-

sume that the First Amendment applies,[4] it would not be dispositive, because we would then balance Keen's First Amendment right against the University's interest in ensuring that its students receive a fair grade and are not subject to demeaning, insulting, and inappropriate comments.

The Supreme Court has stated in this context that "[t]he problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734-35, 20 L.Ed.2d 811 (1968). Ample evidence supports the conclusion that Johnson did not receive a fair grade (the grade was based, *ex post facto*, on her "failure" to apologize properly in letters written over the summer) and received demeaning and insulting letters (which among other things disparaged her goal of becoming a teacher). Keen's argument, taken to its logical extreme, would prevent a university from punishing a professor who failed a student for refusing sexual advances. The First Amendment does not shield Keen's conduct from sanctions.

■ Was Keen sanctioned in an appropriate manner? Keen's best argument, perhaps, is that Penson's initial sanction—requiring Keen to apologize to the Johnsons and to change Kathleen Johnson's grade—violated his First Amendment rights. The First Amendment has been held to bar the state from forcing persons to express opinions or beliefs with which they do not agree. *Wooley v. Maynard*, 430 U.S. 705, 714, 97 S.Ct. 1428, 1435, 51 L.Ed.2d 752 (1977). The court in *Parate* stated that "the individual professor may

not be compelled, by university officials, to change a grade that the professor previously assigned to her student." *Parate*, 868 F.2d at 828.

Keen claims he was punished for not making the demanded apology and not changing Johnson's grade. This is not an entirely accurate description, however, of how and why Keen was disciplined; therefore, we express neither approval nor disapproval of the Sixth Circuit's somewhat broad statement in *Parate* quoted in the previous paragraph.[5] Keen's conduct was found at the earliest stage to merit severe sanction; Professor Lucas, indeed, recommended dismissal proceedings if Keen failed to apologize and change Johnson's grade. This initial proposal by Lucas (as later ameliorated by Penson) led to the somewhat unusual scenario where Keen was essentially given a choice of punishments: write a letter of apology and change Johnson's grade, or suffer a loss of rank and salary.

Keen selected the second option. It is true that if Keen had written the apology and changed Johnson's grade, he could have avoided the loss of rank and salary. In a "but-for" sense, then, Keen was demoted because he failed to write the apology. But in a "proximate-cause" sense, he was demoted not because of his failure to apologize and change Johnson's grade but because of his sanctionable misconduct. The second report by the Rouf subcommittee explicitly made this point, and Penson adopted the subcommittee's findings. As the committee appointed by the Board of Regents noted,

> Professor Keen was *not* punished for refusing to change the student's grade or for refusing to apologize to her and her father. He was, rather, subject to

---

4. The Sixth Circuit has recently held that "Because the assignment of a letter grade is symbolic communication intended to send a specific message to the student, the individual professor's communicative act is entitled to *some* measure of First Amendment protection." *Parate v. Isibor*, 868 F.2d 821, 827 (6th Cir.1989) (emphasis added).

5. In any event, *Parate* is distinguishable because there the professor refused to change a grade for a student who cheated on the final exam and submitted falsified medical excuses. His decision was affirmed by independent faculty members, whose advice was overridden by the dean. The court noted that both the dean and the affected student were Nigerian. *Parate*, 868 F.2d at 824-825. These facts are a far cry from our case here.

disciplinary action because his conduct was found to be unprofessional by two faculty committees. Both committees agreed that he should be penalized for his conduct. * * * If no such alternative penalty had been provided for, or if it could somehow be avoided by the assertion of a personal right of Professor Keen's, his misconduct might have escaped punishment altogether. The circumstances reflect the institution's belief that Professor Keen's unprofessional behavior toward the student should be penalized, not that his opinions and views of the situation should be silenced.

R. 18, Ex. T, at 8–9. For these reasons, Keen was appropriately sanctioned.

█ Keen's argument that Penson could not act impartially as a matter of law because Penson made the initial decision to sanction Keen and also upheld his decision in the review stage is without merit. The argument that Penson was inappropriately the judge of his own decision is faulty for several reasons. First, Keen ignores the review by the Board of Regents, which was totally unconnected to Penson. The Board, although it formally declined to review the matter on the record, appointed a committee that heard argument from Keen's counsel and issued a 12–page report thoroughly examining and rejecting his central contentions. In any event, there is not a shred of evidence that Penson was not impartial, especially considering his extra efforts to ensure that Keen received due process. Penson throughout followed the recommendations of independent faculty members, and Keen should be thankful that the one piece of advice Penson did not follow was Professor Lucas' recommendation that dismissal proceedings be commenced against Keen if he did not apologize to the Johnsons.

Finally, Keen also argues that he was unfairly punished because the University of Wisconsin–Oshkosh had no grading policy or clear rules governing communications with students. This argument too is without merit. A university need not adopt a quasi-criminal code before it can discipline its professors or other employees, and

should not be expected to foresee every particular type of unprofessional behavior on the part of its professors. For example, a professor could properly be disciplined for assigning grades on the basis of hair color, even if no rule to that effect had been previously announced.

Professor Keen does not want to be penalized for his letters, yet he penalized his student for speaking up in class. Professor Keen resents being told to apologize to this student, yet he penalized her for failing to apologize to him. Professor Keen does not want students to be the masters of their own grades, yet he attempts to avoid the independently-determined "grade" of at least 10 of his fellow professors that his conduct was unprofessional and sanctionable. "Judicial review of academic decisions * * * is rarely appropriate, particularly where orderly administrative procedures are followed." *Regents of University of Michigan v. Ewing,* 474 U.S. 214, 230, 106 S.Ct. 507, 516, 88 L.Ed.2d 523 (1985) (Powell, J., concurring). Because there is no genuine issue of material fact and Penson is entitled to judgment as a matter of law, the ruling of the district court is affirmed.

### *APPENDIX*

SUMMER CORRESPONDENCE BETWEEN KATHLEEN JOHNSON AND PROFESSOR CARL KEEN (EDITED)

1. *July 12, 1985 letter from Johnson to Keen (1 page)*

Dear Professor Keen and classmates:
* * * I understand that I received the grade of incomplete [in English 226] because I failed to attend an appointment with Professor Keen on Thursday, May 9, at 1:45 p.m. I'm sorry if this caused any inconvenience, but it was my understanding that because we met on Tuesday, May 7, the meeting on Thursday was not required.

In addition, I made a couple of statements during some of our class discussion regarding the **optional** book report and the spot quizzes as being unfair.

Normally, I confront my professors privately whenever I have a question and/or comment about their class; however, Professor Keen, you **always** asked for our questions and/or comments before **every** class period. As a result, I found class time to be the most appropriate time to bring up my comments.

* * * I apologize for expressing my comments during class discussion time as it was my intention to provide constructive criticism and not to create a "negative" class atmosphere, and I possibly should have confronted you in private first.

2. *July 19, 1985 letter from Keen to Johnson (1 page)*

Dear Ms. Johnson:

* * * Your apology for the "inconvenience" caused by your failure to keep the appointment you signed for, or to notify me via note or quick phone call to the contrary, is acceptable. The rest of your letter is not.

Even though you took in excess of a month to compose and mail your letter of July 12, it side-steps, ignores and/or distorts just about everything we reviewed and agreed upon during our telephone conversation of June 5, 1985. * * *

Hopefully you should recall that a major feature of English 226 was continued practice of basic principles of interpretation. To this day you seem persistent in trying to convince me that you are a poor interpreter of the given facts of the present case study or, what would be worse, a dishonest one. Your repeated hit-and-run accusations of "unfairness," made in class, call for a public retraction, or an apology that clearly demonstrates your (perhaps newly acquired) awareness of the matter.

Perhaps such an acceptable apology is difficult for you to compose. If so, please be informed that [in the fall] my office door will be open again to you and all the other students, as usual; perhaps I can offer some additional tips on how to write your letter.

3. *July 25, 1985 letter from Johnson to Keen (2 pages)*

Dear Professor Keen:

* * * I apologize for apparently missing some of the points that we discussed during our telephone conversation * * *, as it was definitely not my intent to do so. I thought that I included all of the points of discussion in my letter; however, you informed me that I didn't, and I am sorry for misunderstanding you.

* * * I'm not quite clear why my apology [regarding my in-class comments] wasn't accepted. Perhaps it's because I failed to express my reasons for stating the comments of unfairness that I made in class. After we had our telephone conversation, I didn't think that you wanted me to write in the letter my reasons for the comments; however, I believe you do and I would be more than happy to state them to you.

I felt that the book report was unfair because even though it was **optional** it still counted ten per cent of the student's grade. In all my other classes from grade school through college, any assignment that was optional meant it was the students' choice as to whether they wanted to do the assignment for extra points. * * * I believe I understand how the grading system includes the book report, and I apologize for misinterpreting you, Professor Keen, and the syllabus. In addition, I apologize to my classmates for stating that the optional book report was unfair during class discussion time.

I also stated that the spot quizzes were unfair. After giving this statement some rational thought, I realize now that I shouldn't have made that statement. I have always held a grudge against spot quizzes * * *: this is something I will have to work out with myself * * *. I realize that just because I don't like them doesn't mean that they are unfair. As a result, I am sorry for stating that spot quizzes are unfair.

I didn't mean any harm to the class by these statements, and I sincerely hope that I have interpreted your letter and responded to it correctly.

4. *July 30, 1985 letter from Keen to Johnson (11 pages)*

Dear Ms. Johnson:

I have received your letter of July 25, 1985, which was, thank you, a rather prompt response to mine of July 19, 1985.

The best I can say about your recent correspondence is that compared to your letter of July 12 yours of July 25 is better. * * * You are improving your demonstration of confronting the truth * * *, but you still have a way to go concerning 'the truth, the whole truth and nothing but the truth.' That is what you ought to "confront" (rather than me or anything else).

Perhaps you have already done the best that you are capable of doing by way of apology/explanation/interpretation/opinion-making.... If that is the case, then be advised that I will have to determine your 226 course grade on the basis of all the evidence which you have thus far presented. * * * If you do not [turn in all your papers to me], then I will have to determine your final grade on the basis of what I can presently review (e.g., grades and notes in my record book, my memory of your academic performance during the semester, and your recent correspondence).

In the meantime, should you send additional correspondence, I will review that as well.

Again, it may possibly be that you have already done your best, and it is not my intent to try to draw out of you that which simply may be beyond your present abilities. However, I would like to think you can do better * * *. The following is also intended to help you with writing any future letter(s), between now and September, which additional (and hopefully even better) letter(s) of yours I can then take into account for determining your final grade.

1. There are certain FACTS/evidence/data in this case which you have yet to recognize/admit/deal with clearly and completely. For instances:

a. Course handouts (including Syllabus Notes and Definition of Grade Symbols) were given to you the very first class meeting. These were expanded upon orally.

["FACTS" b. through r. omitted]

s. One day after class—after your repeated accusations of "unfairness," I requested that you explain your reasons in writing, and I gave you a reason for my request: I informed you that should you write your reasons that the very act of composition might help you to get at the truth of the matter. I said that it was a request, not a requirement * * *. You chose not to do so, nor did you bother to give any reason (not even orally) for why you chose the option of refusing or denying my request.

t. During our telephone conversation of June 5, 1985, I informed you emphatically that the request (item *s* above) was no longer a request but rather a demand, that it was no longer an option but a requirement that you thoroughly explain your "unfair" accusations in writing. I also informed you on the phone that because your allegations were made publicly, in class, your apology should also be public to your classmates.

2. COMMENTS/opinions/interpretations ...:

a. * * * If you were the only type [of student I taught], I might consider, without being too facetious about the matter, beginning each [class] with the question, "What are today's accusations of unfairness about course policies?" But thankfully, you are not the only type * * *.

["COMMENTS" b. through m. omitted]

n. At the beginning of spring semester 1985, you noted that your educational goal was to become a grade-school teacher. * * * Right now, Ms. Johnson, I have reasons to doubt whether I ought to add my little contribution or approval to the certifications process of your becom-

ing a teacher, a true teacher that is. Maybe some other worthy occupational goal would be more suitable to your talents, and then again, maybe not. Some more time, I suppose, will tell. . . .

To leave off what may or may not be an appropriate digression, I'll return now to the immediate subject of your performance in 226 by listing some questions which presently come to mind and which I am *requesting* that you answer. * * * I hope that these questions and your answers will help gain [sic] an insight on the whole matter of fairness, okay?

3. QUESTIONS * * *

   a. Is it *fair* or *unfair* for a student to judge the class rules/policies by the standard of rules/policies of some different class? ___

   b. Is it *fair* or *unfair* for a student to make unsupported accusations/assertions? ___

   c. Is it a *fair* or *unfair* assumption that a university sophomore can read and understand handouts such as those at the beginning of 226 last spring? ___

   [QUESTIONS d. through y. omitted]

   z. From the history of education (and focusing upon just three examples now), who do you think was the best teacher: *Socrates, Jesus,* or *John Dewey?* ___

In present conclusion (and in view of exhausting the alphabet above), I am wondering, as a matter of fact, Ms. Johnson, whether you have had any assistance in handling this entire matter so far or whether you've written your letters completely on your own * * *?

5. *August 6, 1985 letter from Johnson to Keen (1 page)*

Dear Professor Keen:

I am writing this letter to inform you that I have received your July 30th letter. In my letter of July 25th, I indicated my reasons for making my comments in class and my awareness as to why I shouldn't have said them. In addi-

tion, I apologized for making my comments. As a result, I feel I have completed your requirements regarding my incomplete grade and would appreciate a response to my letter indicating what my final grade will be based on my academic performance of tests, quizzes, etc. thank you.

6. *August 9, 1985 letter from Keen to Johnson (1 page)*

Dear Ms. Johnson:

In reference to your letter of August 6, I had hoped that you would be able to cooperate at least to the extent of writing your answers to my questions of July 30 (pages 8 thru 11) as a preliminary to drafting a satisfactory letter to the 226 students.

·At present, I find that your attitude continues to be as unscholarly as it is objectionable; you have until September to convince me otherwise.