**Eileen W. HARRISON, Plaintiff,**

v.

**Eldon F. COFFMAN, Individually acting under the color of state law as the Chairman of the Arkansas Workers' Compensation Commission, et al., Defendants.**

No. LR–C–98–716.

United States District Court,
E.D. Arkansas,
Western Division.

Jan. 25, 1999.

John T. Lavey, Lavey and Burnett, Janet L. Pulliam, Pulliam and Wright, P.A., Little Rock, AR, for Plaintiffs.

Gregory L. Crow and Rhonda M. Thornton, Assistants Attorney General, Little Rock, AR, for Defendants.

## MEMORANDUM AND ORDER

SACHS, District Judge, sitting by designation.

Plaintiff Harrison is a former administrative law judge (ALJ) who was engaged in the initial adjudication of workers' compensation claims under Arkansas law. She alleges a violation of First Amendment rights (as incorporated by the Fourteenth Amendment) by reason of her termination in August 1998, by majority vote of the defendant members of the Workers' Compensation Commission.[1] Her employment was at will, but she contends it could not be terminated on grounds violating the United States Constitution.

---

1. The structure of the Commission is described in *Webb v. Workers' Compensation Comm'n*, 292 Ark. 349, 730 S.W.2d 222 (1987).

The allegations of the first amended complaint, which must be taken as true for purposes of a motion to dismiss, are that the Commission majority rejected her services because "she exercised her free speech right to independently and impartially decide cases before her in a competent manner within a range of reason and without imposed or required prejudgment, partiality or ideological bias." In effect she alleges that her exercise of quasi-judicial independence and impartiality, as reflected in her written opinions, caused her to be discharged.[2]

The first amended complaint asserts a violation of 42 U.S.C. § 1983. The motion to dismiss the original complaint has been fully briefed and, to expedite processing, defendants have realleged and adopted the original motion to dismiss and prior briefing.

Arguments presented by the defense are that (1) plaintiff's position was not judicial, under Arkansas law; (2) speech in the form of opinion-writing, when advanced as an employee rather than as a citizen, involves employment conduct that is not protected by the First Amendment; (3) defendants are entitled to qualified immunity; (4) the State of Arkansas is immune from suit under the Eleventh Amendment; and (5) neither the State nor its officers acting officially are "persons" for purposes of § 1983.

■ Although plaintiff may have been employed in the Executive Branch of State government, this does not preclude treating her work as judicial or quasi-judicial, for federal constitutional analysis. *Compare, Butz v. Economou,* 438 U.S. 478, 511–13, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (ALJs have absolute personal immunity from damages for quasi-judicial conduct). The State law rule is apparently the same. *Robinson v. Langdon,* 333 Ark. 662, 970 S.W.2d 292, 295–96 (1998).

The dispositive issue is presented in defendants' second point. They rely largely on two decisions of the Court of Appeals for the Eighth Circuit. In 1971, then District Judge Henley dismissed a suit brought under § 1983 by a discharged referee for the same commission; this apparently is the same position now called administrative law judge. *Diles v. Woolsey,* 468 F.2d 614 (8th Cir.1972). In that case, however, unlike the present one, there was no allegation of interference with decisional independence, but rather a contention that "apparently Diles simply had become 'persona non grata to the members of the Commission....'" 468 F.2d at 614. Under those factual circumstances the contention on appeal that plaintiff had been "discharged in retaliation for his exercise of free speech" was held to be without merit.

The *Diles* case seems to have been decided more as a matter of pleading than substance, and in addition appears to have been pursued for procedural irregularity, which did not rise to a constitutional level. Given the pleadings here, *Diles* is not squarely favorable to the defense. Moreover, there have been so many developments in First Amendment law since the early 1970s so that it seems appropriate to review current law. In any event, *Diles* is distinguishable.

■ Defendants next argue and reiterate in their reply brief that unidentified opinions of an ALJ should not be classified as matters of "public concern," as is supposedly universally required for protection of employee speech. *Connick v. Myers,* 461 U.S. 138, 143, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). A decision of the Circuit on this point is relied on by defendants. *Bausworth v. Hazelwood Sch. Dist.,* 986 F.2d 1197 (8th Cir. 1993). Insofar as *Bausworth* has occasionally been read to require that protected speech be "concerned citizen" talk or writing, intended to reach a public audience, this interpretation has been rejected by later decisions. It is now clear that "internal" speech, restricted to a limited audience, may be protected if it reaches beyond the "parochial concerns" of the employee. *Mumford v. Godfried,* 52 F.3d 756, 760–62 (8th Cir.1995); *Kincade v. City of Blue Springs,* 64 F.3d 389, 396 (8th Cir.1995).

---

**2.** Plaintiff's brief in opposition offers, at page 8, as a purely hypothetical basis for her termination, that her opinions show she was not "sufficiently biased in favor of employers' or insurance companies' interests...." It is inferred that plaintiff will seek discovery to verify current suspicions, and that her pleading is designed to avoid asserting suspicions as facts.

In the present case, it is clear that rulings by an ALJ are not of parochial concern; they involve more than the personal wishes or well-being of the author. At the same time, it may be acknowledged that few such opinions (and none here identified) fall obviously within the "public concern" category. Determining what is of "public interest" may well turn out to be an exercise in frustration, as the Supreme Court determined in defamation law in its aborted *Rosenbloom* theory.[3] *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 346–47, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). It is my view, however, at least at this stage of the litigation, that any retaliation against plaintiff because of alleged content-based disapproval of her rulings and opinions more likely relates to matters of "public concern" than of parochial, internal administrative matters.[4]

Although I find the "public concern" issue somewhat elusive in the present context, it must be understood that a great deal of public employee speech is protected without evaluating the first part of the balancing test under *Connick* or *Pickering*[5] where the employer's efficiency of operations has not been introduced as an issue, and it is difficult to imagine a workplace interference contention. This is repeatedly emphasized in *Burnham v. Ianni, supra* n. 4, 119 F.3d at 678–79, an "academic freedom" case recently considered by the Court en banc. It is difficult to see why the *Burnham* approach would not be used in a courtroom context as well as in the classroom.

 This case, as alleged, plainly involves quasi-judicial "decisional independence." This subject is not infrequently litigated by federal ALJs and is generally decided as a matter of statutory law. *See, e.g., Nash v. Califano*, 613 F.2d 10 (2d Cir.1980); *D'Amico v. Schweiker*, 698 F.2d 903, 907 (7th Cir. 1983); *Association of Administrative Law Judges, Inc. v. Heckler*, 594 F.Supp. 1132 (D.D.C.1984). The decisional independence of federal ALJs is protected by the statutory requirement that there be cause for removals. It has been supposed that decisional independence lacks constitutional protection (*Nash*, 613 F.2d at 15), but it has also been noted that the existence of constitutional protection is an unsettled issue. *Stephens v. Merit Sys. Protection Bd.*, 986 F.2d 493, 497–98 (Fed.Cir.1993).

Whether or not constitutional protection of decisional independence can be soundly advocated as a matter of "good government" (it must be recognized that it could be invoked by undesirable as well as admirable judges), it does seem logically and historically compelled under the expansive view of the First Amendment that covers academic freedom and is evidenced in other major rulings of the Supreme Court during the past thirty years. The protection of classroom expression within definable limits seems on a par with constitutionally appropriate protection of decisional independence. Compare Justice Frankfurter's eloquent linkage of academic freedom with the First Amendment in his concurrence in *Wieman v. Updegraff*, 344 U.S. 183, 195, 73 S.Ct. 215, 97 L.Ed. 216 (1952), with his equally energetic insistence on protection of judicial independence in his dissent in a contempt proceeding, *Bridges v. California*, 314 U.S. 252, 283–84, 62 S.Ct. 190, 86 L.Ed. 192 (1941).

---

**3.** *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971). For example, I find it difficult to reconcile one sentence in *Day v. Johnson*, 119 F.3d 650, 657 (8th Cir. 1997), that relies on *Bausworth*, with *Mumford* or *Kincade*, or the contemporaneous ruling of the Court en banc in *Burnham, infra* n. 4. For reasons stated below, I believe that hair-splitting theories are not pertinent or dispositive here.

**4.** This does not imply that I believe there can be no disciplinary action taken against an ALJ whose decisions routinely or flagrantly violate her superiors' views of what is appropriate. A high reversal rate, for example, or inappropriate modes of expression, may well be subject to discipline. The problem strikes me as being comparable to what may justify academic discipline, a matter discussed below. In that context it does need to be remembered that "the government, as an employer, has broader powers in suppressing free speech than the government as sovereign." *Burnham v. Ianni*, 119 F.3d 668, 680 (8th Cir.1997) (en banc). It is only in this sense that I believe plaintiff's status as an employee may restrict her claim—and this cannot be dealt with until after the record is expanded, presumably in discovery.

**5.** *Pickering v. Board of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

The academic freedom cases occasionally offer close parallels to the protection of decisional independence, as pled here. In *Berg v. Bruce*, 112 F.3d 322, 328–29 (8th Cir.1997), a discharged teacher contended that "the First Amendment constitutionally protected her right to assign grades as she saw fit, without interference from [the principal]." The Circuit found it unnecessary to rule the issue, but did cite another case in the same context, *Parate v. Isibor*, 868 F.2d 821, 827–30 (6th Cir.1989), which found such a constitutional violation in a rather flagrant instance of forcing a teacher to change a student's grade. On the other hand, it has been held that a teacher's patently abusive grading practice may result in constitutionally acceptable discipline. *Keen v. Penson*, 970 F.2d 252, 257–58 (7th Cir.1992). If grading practices of teachers may sometimes merit First Amendment analysis, it seems almost certain that opinion-writing by both traditional judges and administrative law judges properly claims First Amendment protection.

Recognition of a First Amendment right to decisional independence would doubtless have some tendency to create virtual life tenure for ALJs, as Justice Scalia indicates has occurred in the federal system. "The ALJ Fiasco—A Reprise," 47 University of Chicago Law Review 57 (1979). On the other hand, recognition of teachers' comparable rights (a rather more far-reaching occurrence, considering the numbers involved) has probably not imperiled appropriate administration and discipline. *See, e.g., Ahern v. Board of Educ. of Sch. Dist. of Grand Island*, 456 F.2d 399, 403–04 (8th Cir.1972) (affirming Judge Urbom's ruling that there is no right " 'to teach politics in a course in economics' "); *Patterson v. Masem*, 774 F.2d 251, 257 (8th Cir.1985) (affirming Judge Woods' ruling sustaining a teaching assignment based on concern that a teacher having a "propensit[y] toward censorship and bowd-

lerism" lacked desirable qualifications for supervising teaching of literature and history).

■ Although further development of the issues may show that this case does not ultimately turn on whether there is a First Amendment right to decisional independence, I am presently prepared to recognize such a right in ruling the motion to dismiss. This may well be the first decision so holding. I am fairly sure, given the First Amendment rights of teachers, that judges enjoy the protection asserted by plaintiff.[6]

\* \* \* \* \* \*

Turning to the remaining issues of qualified immunity and the status of claims against the defendants in their official capacity, it is clear that while the rulings on these subjects shape the litigation before me they do not dispose of it.

■ The claim for injunctive relief (reinstatement) properly remains in the case, despite the Eleventh Amendment rights of the State of Arkansas. As stated in *Will*,[7] cited by defendants, "Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983...." Another case cited by defendants, *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 59, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), reaffirms the inapplicability of the Eleventh Amendment defense to injunctive claims based on the Fourteenth Amendment and § 1983. *See also Lynn v. West*, 134 F.3d 582, 587–88 (4th Cir.1998).

■ The qualified immunity issue asserted by defendants in their individual capacities is somewhat more difficult to decide. They are protected from damage claims "insofar as their conduct does not violate [a] clearly established ... constitutional ... right[ ] of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). It is defendants' obligation, however, to dem-

---

6. The State of Arkansas seems to come close to acknowledging this when it contends that "employees of the executive branch can be removed at any time for no particular reason, while true judges can not." As previously stated, I am satisfied that since ALJs enjoy absolute immunity for their quasi-judicial work product, that work product has the same First Amendment protec-

tion from retaliation against the authors as is enjoyed by similar works produced in the judicial branch.

7. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 n. 10, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

onstrate that the First Amendment rights asserted by plaintiff were not clearly established. *Burnham, supra,* 119 F.3d at 674.

Defendants' briefing concentrates on claimed defenses, none of which are particularly persuasive: (1) the Executive Branch status of plaintiff, (2) her opinions not being announced in her role as a citizen and not relating to matters of "public concern," and (3) the termination was subject to Eleventh Amendment protection and was not covered by § 1983. Defendants offer no tenable argument that ALJ opinion-writing is not protected quasi-judicial speech, entitled to absolute immunity from damage claims. *Butz* and *Robinson* establish the contrary. Whether opinion-writing also enjoys employment protection from retaliatory action by plaintiff's public employers is not directly discussed in defendants' briefing and is not dealt with by plaintiff.

I acknowledge that the protection I find in the Constitution has considerable novelty, and that I presently believe this to be a case of first impression. If briefed by the parties I might have difficulty ruling that the protection, though previously unstated, is nevertheless "clearly established." But the burden of proof is on defendants, and they have so far failed to carry that burden. This ruling is not, however, necessarily dispositive when the facts are more clearly developed, if a motion for summary judgment should be filed to avoid damages by asserting qualified immunity.

On the present record the motion to dismiss, in all of its aspects, is hereby DENIED.