**Eileen W. HARRISON, Plaintiff,**

**v.**

**Eldon F. COFFMAN, in his official capacity as the Chairman of the Arkansas Workers' Compensation Commission; and Michael K. Wilson, in his official capacity as a Commissioner of the Arkansas Workers' Compensation Commission, Defendants.**

**No. LR–C–98–716.**

United States District Court,
E.D. Arkansas,
Western Division.

July 27, 2000.

John T. Lavey, Lavey & Burnett, Little Rock, AR, Janet L. Pulliam, Pulliam and Wright, P.A., Little Rock, AR, for Eileen W. Harrison, plaintiff.

Timothy Gerard Gauger, Arkansas Attorney General's Office, Little Rock, AR, J. Leon Holmes, Williams & Anderson, Little Rock, AR, Gregory L. Crow, Arkansas Contractors Licensing Board, Little Rock, AR, Sammye L. Taylor, Arkansas Attorney General's Office, Little Rock, AR, Kristine Gerhard Baker, Quattlebaum, Grooms, Tull & Burrow PLLC, Little Rock, AR, for Eldon F. Coffman, in his official capacity as the Chairman of the Arkansas Workers' Compensation Commission, defendant.

### MEMORANDUM AND ORDER

SACHS, District Judge.

After discovery, defendants seek summary judgment in this case brought by plaintiff Harrison, challenging her termination as an administrative law judge (ALJ) in the Arkansas workers' compensation system. First Amendment violations are asserted; that is, content-based interference with her expressive exercise of judicial independence. I have previously denied defendants' motion to dismiss. *Harrison v. Coffman*, 35 F.Supp.2d 722 (E.D.Ark.1999).

Defendants offer two theories in support of their current motion: (1) as a state employee plaintiff cannot assert First Amendment claims against her employer when the conduct at issue was her regular work product (deciding cases and writing opinions) rather than speech of a more public, civic nature; and (2) the termination was based on defendants' perception of plaintiff's excessively activist role in the *Reddick* case, which allegedly justified managerial intervention (more than a simple reversal) as a matter of constitutional law.

### I.

The "employee speech" defense was rejected by me on initial consideration. Defendants quite appropriately urge reconsideration of this important and elusive issue. Their position now finds support in a split decision of the Fourth Circuit, sitting en banc, filed June 23, 2000. *Urofsky v. Gilmore*, 216 F.3d 401 (4th Cir.2000). Seven out of twelve judges ruled that professors at a state university had no standing to seek constitutional protection for their work, to overcome state law censorship of Internet use of office computers. Plaintiffs' ordinary work was not, according to the majority, entitled to any First Amendment protection, even though the statute infringed plaintiffs' academic freedom. The court was evenly divided on the issue, however; one of the majority judges felt bound by a prior circuit decision that he believed was wrong.

On limited examination I am rather inclined toward the concurring opinion of Chief Judge Wilkinson, who concluded that the professors did indeed have standing to assert their academic freedom interests as First Amendment rights, but also concluded the Virginia statute could be saved because plaintiffs could use uncensored Internet programming on state-owned com-

puters with the approval of department heads.

In my earlier ruling here, I concluded that "internal" speech by an employee, restricted to a limited audience, may be protected if it reaches beyond the "parochial concerns" of the employee. 35 F.Supp.2d at 724 (citing *Mumford v. Godfried,* 52 F.3d 756, 760–62 (8th Cir.1995), and *Kincade v. City of Blue Springs,* 64 F.3d 389, 396 (8th Cir.1995)). After my decision, the Eighth Circuit decided a case in which a police officer was demoted because an incident write-up he had prepared was questioned by the police chief, and the officer refused to re-write the statements. The Court held that since the statements were "entirely internal" to the police department[1] and the plaintiff was simply acting routinely as an employee of the department, the report was not a matter of public concern and was unprotected by the First Amendment. *Buazard v. Meridith,* 172 F.3d 546, 549 (8th Cir.1999).

In a case cited in my earlier ruling a sister circuit held, however, there was a First Amendment violation of the right of academic freedom when a teacher was compelled to change a grade given to a student favored by the principal. *Parate v. Isibor,* 868 F.2d 821, 830 (6th Cir.1989). *Buazard* comes close to rejecting *Parate,* at least as to the discipline for refusal to modify the report, unless the academic freedom issue adds a dimension to the First Amendment claim in *Parate* that our Circuit would likely recognize.

Most of the academic freedom cases arise in the context of employee conduct that may be considered routine, yet they are generally decided on the merits (except in the Fourth Circuit), balancing the First Amendment rights of the teacher against the rights of higher supervisory authority. *See, e.g., Lovelace v. Southeast-*

*ern Mass. Univ.,* 793 F.2d 419 (1st Cir. 1986). Our Circuit has placed no roadblock against consideration of academic freedom claims on the merits as First Amendment issues, even though the speaker was simply acting as a government employee. *See, e.g., Ahern v. Board of Educ. of Sch. Dist. of Grand Island,* 456 F.2d 399, 403–04 (8th Cir.1972); *Patterson v. Masem,* 774 F.2d 251, 257 (8th Cir. 1985); *Cox v. Dardanelle Public School Dist.,* 790 F.2d 668 (8th Cir.1986).

*Cox* is of interest in protecting the filing of employee grievances relating to teaching techniques while rejecting consideration of complaints about more parochial personnel policies. The Court concluded that "a significant portion of Cox's speech was of public concern." 790 F.2d at 673. In the present case we are dealing with rulings in adjudication which have nothing to do with parochial, personal concerns of plaintiff. We are dealing with expressive conduct that seems inherently of public concern, as defendants tacitly acknowledge by asserting widespread reaction to the *Reddick* decision.[2]

*Patterson* involved the selection and editing of a play. The Court noted that the teacher's conduct "did indeed address a matter of public concern" even though her assignment was simply a "part of her duties." 774 F.2d at 257, 253. Rejection of the plaintiff's claim was on the merits, balancing her academic freedom assertion against the supervisory authority of her superiors. The Fourth Circuit, by contrast, recently took a more restrictive view, holding it could not consider First Amendment claims when presented with an "ordinary employment dispute" regarding disagreement with school officials about use of a play. *Boring v. Buncombe County Bd. of Educ.,* 136 F.3d 364 (4th Cir. en banc 1998). *Boring* construes the

---

**1.** I suppose it could be argued that ALJ rulings are addressed to outside parties and that this external distribution somewhat distinguishes *Buazard, infra.*

**2.** It remains to be seen whether a small number of influential persons were repeatedly complaining about the decision or whether the employer-insurer community was truly aroused.

"public concern" issue more narrowly than our Court did in *Patterson;* this was simply a foretaste of the blanket rejection of academic freedom issues as "employee speech" in *Urofsky, supra.* I thus believe the Fourth Circuit is at least two steps out of phase with the academic freedom decisions in the Eighth Circuit.

In my previous ruling I found a compelling analogy between First Amendment academic freedom claims in the teaching profession and the assertion here of First Amendment rights of a judicial officer who claims interference with her decisional independence. There is now an appellate decision using the same analogy and recognizing a viable claim deserving trial when a hearing officer was discharged, allegedly because his rulings in inmate cases failed to meet a statistical conviction goal advocated by his supervisors. *Perry v. McGinnis,* 209 F.3d 597 (6th Cir.2000). As in the teaching cases, it was assumed in *Perry* that some routine employee speech is protected, and that the issues were of more than "parochial concern" unworthy of First Amendment analysis.

I acknowledge that there is Eighth Circuit language in *Buazard* and elsewhere which, if taken out of context, would prevent reaching the merits in most teaching cases and probably this case simply as a matter of standing. I do not believe, however, that the Circuit is likely to endorse the major restriction on First Amendment coverage of the teaching profession, as advocated by half the judges in *Urofsky.* I am reinforced by *Perry* in my belief that the teaching and judging cases are likely to receive similar constitutional handling.

■ The "employee speech" defense is therefore rejected, reaffirming what I did in ruling the motion to dismiss.

## II.

Having decided that plaintiff's First Amendment claim deserves an answer on the merits, I do agree with defendants that one possible approach to the merits is outlined simply and soundly in the *Lovelace* case *supra,* which has the added weight of having Judge, now Justice, Breyer on the panel. That case holds that a teacher's grading standards must, as a matter of employment law, generally yield to the standards set by the school administration. 793 F.2d at 425–6. The teacher was rightfully terminated for insisting on a grading scale disapproved by the administration. First Amendment balancing was used in a fact-specific manner and the First Circuit ruling was essentially that "insubordination in refusing to grade as directed—would not be protected." In other words, managerial rights and duties outweighed the free speech interests.[3]

On the other hand, I also accept the *Perry* case for its insistence, in the case of persons having a judicial role, that any supervisory authority be exercised in a principled, lawful manner, and in good faith, rather than in some flagrantly arbitrary or tainted mode. At least to that limited extent I believe the First Amendment decisional independence of trial judges will and should be protected.

In *Perry* the allegation was that the plaintiff hearing officer had been removed because he failed to decide inmate disciplinary cases in a manner that would result in no more than a 10% acquittal or dismissal rate. 209 F.3d at 605. Perry's acquittal rate was between 17% and 18%, "well above the institutional standard of 10%." The panel ruled that any insistence

---

**3.** Conventional *Connick–Pickering* concerns are apparently not controlling in this context, where the state's interest in enforcing the policies of the administration is alone a sufficient consideration. *Compare, Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), and *Pickering v. Bd. of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). While written policies and standards (which are absent here) may be useful as a matter of good administration and fairness to employees, I doubt there is a constitutional prohibition against using ad hoc, unwritten policies. In any event this aspect of the controversy would be a due process issue not presented in this case.

by management that there be a 90% conviction rate would mean that the hearing officers "cannot possibly be impartial," as required by *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). If the claim were proven as alleged, and causation was shown, the prison authorities would be unable to enforce their policy by disciplining plaintiff. The supervisory interest advanced is "not a legitimate organizational interest." 209 F.3d at 607.

The balancing test that would be used if both *Lovelace* and *Perry* were followed would make only egregious managerial abuse of authority subject to Federal Court correction, as a matter of constitutional law.

I suppose the test might be somewhat like that used in judicial examination of criminal law administration, where there are Federal prosecutorial decisions not to seek downward departures from Guidelines at sentencing. Even when "sole discretion" is retained by the prosecution in plea agreements, the courts enforce an implicit requirement of good faith avoidance of plainly arbitrary conduct. *United States v. Due*, 205 F.3d 1030, 1034 (8th Cir.2000); *United States v. Kelly*, 18 F.3d 612, 618 (8th Cir.1994). Such a test seems to have been manageable and should be used in this case, in my judgment. I believe it reflects the degree of judicial caution that is suitable in separation of powers cases and where federalism is involved.

## III.

■ Turning to the facts, it is clear that defendants have submitted a good deal less than might win them summary judgment. Their contention is that plaintiff's ruling in a case before her, referred to as the *Reddick* litigation, evidenced such an improper, activist approach to her role as to justify a discretionary termination. She allegedly raised issues sua sponte and went outside her assigned role by making a ruling on constitutionality of a portion of an Arkansas statute.

Plaintiff's *Reddick* opinion was filed in July 1997, a full year before her termination in August 1998. The contents of the ruling were known to the three Commissioners at least ninety days before it was reversed by them in May 1998. In the meantime, Chairman Coffman, who held the controlling vote on the Commission, had sought out Judge Henry Woods, father of plaintiff, at a reception in Fort Smith. According to the Woods deposition, he praised plaintiff's work, told Judge Woods that plaintiff's job was in jeopardy because of employer opposition, and said he believed he could save her position. Chairman Coffman's version of the conversation was that it was simply mildly complimentary, in a manner that might please a father, but that he gave no warning and volunteered no support. The Woods version would be implicitly inconsistent with a theory that Chairman Coffman personally considered the *Reddick* ruling a career-threatening blunder in judging.

Plaintiff also has the support of an affidavit from Robert E. Compton, relating to a conversation with Chairman Coffman that allegedly occurred about the time the Commission released its decision reversing *Reddick*. Affiant quotes Chairman Coffman as saying plaintiff was very good at her job, and that he did not expect her to be terminated. This material also places in contest a post-litigation version of events that Chairman Coffman considered *Reddick* a controlling factor justifying termination.

Defendants offer neither deposition testimony nor an affidavit from Chairman Coffman supporting their *Reddick* theory of causation. There is a transcript of a recorded statement in March 1999, in which Chairman Coffman refers to three termination factors: the *Reddick* controversy, a claim that plaintiff Harrison was comparatively slow getting out rulings and a lawyer's complaint just before the termination about an incident of alleged uncooperative scheduling. The unsworn state-

ment also refers to plaintiff as an ALJ with a reputation as a "liberal," apparently meaning one who might "lean toward" employees, but further observed that in her reversal record plaintiff was "probably about a third down the list."

The recorded statement does not deal with information developed in later discovery that would suggest that Chairman Coffman was subject to outside pressures from one class of litigants to get plaintiff terminated. One reading of events could be that he did not exercise independent judgment but reluctantly yielded to such pressures.[4]

There is further evidence, according to deposition testimony, that some management attorneys and lobbyists had been working directly and through the Governor's office to get the Commission to terminate plaintiff because they found her unfriendly to employer interests in the cases before her (or unduly sympathetic or "liberal" toward claimants). Defendants do not seek to establish their own perception of bias as a defense, nor do they show that Chairmen Coffman considered that plaintiff had such a pronounced bias as to merit termination. His comment about her reversal rate suggests the contrary.

Based on the foregoing it is my view, subject to reconsideration by the ultimate trial judge,[5] that the existence or absence of good faith motivation of Chairman Coffman in casting the deciding vote to terminate plaintiff would be one of the decisive questions at trial. Did his vote reflect "a legitimate organizational interest"? That

cannot be ascertained on the current record, particularly when the defense places its focus on the *Reddick* case.

Defendants' motion for summary judgment is therefore DENIED.

---

**4.** There is evidence that discharging plaintiff was a subject of conversation between the Governor's staff and Commission staff, and that Chairman Coffman acted only after receiving what could be considered a "message".

A possible theory of defense not presented by defendants is that the Governor or an agent having apparent authority had a right to, and did, cause the removal. Such a theory might raise other issues about a patronage discharge under current constitutional law, but that problem is not presented here. Note, however, both the major differences and in-

teresting similarities between executive control over purported quasi-judicial officers in *Humphrey's Executor v. United States*, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935), and in this case and *Perry*.

**5.** It now appears that evaluation of the trial or deposition testimony of Judge Woods may have some significance at trial. Having served in the Circuit with Judge Woods for some twenty years, I feel it appropriate to recuse as the initial fact-finder in what is now a court-tried case seeking equitable relief. I will do so by separate order.